**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0055-15T1

J.P.,

    Plaintiff-Appellant/
Cross-Respondent,

v.

GREGORY J. SMITH, COUNTY OF OCEAN,
CITY OF MANAHAWKIN, TOWNSHIP OF
STAFFORD, and STATE OF NEW JERSEY,

    Defendants,

and

SOUTHERN REGIONAL HIGH SCHOOL and
SOUTHERN REGIONAL HIGH SCHOOL BOARD
OF EDUCATION,

    Defendants-Respondents/
Cross-Appellants.

<table>
<tr><td><strong>APPROVED FOR PUBLICATION</strong></td></tr>
<tr><td><strong>March 7, 2016</strong></td></tr>
<tr><td><strong>APPELLATE DIVISION</strong></td></tr>
</table>

---

Argued January 25, 2016 – Decided March 7, 2016

Before Judges Messano, Carroll, and Sumners.

On appeal from the Superior Court of New
Jersey, Law Division, Ocean County, Docket
No. L-2831-14.

Robert R. Fuggi, Jr., argued the cause for
appellant/cross-respondent (Fuggi Law Firm,
P.C., attorneys; Mr. Fuggi and Ronald A.
Rosa, of counsel and on the briefs).

Jerald J. Howarth argued the cause for
respondents/cross-appellants (Howarth &

Associates, LLC, attorneys; Mr. Howarth and
Purnima D. Ramlakhan, on the brief).

The opinion of the court was delivered by

CARROLL, J.A.D.

In this appeal we address claims of sexual abuse brought by plaintiff J.P. against defendants Southern Regional High School and Southern Regional High School Board of Education (collectively, "the School"). In her complaint, filed in September 2014, plaintiff alleged that, in 2004, she was subjected to repeated sexual abuse by the School's assistant band director, defendant Gregory Smith. The acts of abuse allegedly occurred (1) at the School, where plaintiff was a student; (2) during two School-organized overnight trips; and (3) in plaintiff's home. Plaintiff sought damages pursuant to the Child Sexual Abuse Act (CSAA), N.J.S.A. 2A:61B-1, and under various common law theories of tort liability.

The trial court granted summary judgment dismissing plaintiff's complaint against the School. The motion judge concluded that (1) the School did not qualify as a "household" within the meaning of the CSAA; and (2) plaintiff's claims were barred by the statute of limitations and her failure to comply with the notice provisions of the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3. On reconsideration, the judge declined to disturb the dismissal of plaintiff's CSAA claim

against the School. However, the judge reinstated the common law causes of action and ordered a <u>Lopez</u>[1] hearing to determine the accrual date of those claims.

Pursuant to leave granted, both sides appeal. Because we are not persuaded that, under the facts presented, the School falls within the ambit of the CSAA, we affirm the dismissal of that claim. However, we part company with the trial court's determination that a <u>Lopez</u> hearing is necessary to establish the accrual date of plaintiff's common law causes of action. Since we conclude that those claims accrued no later than July 2013, and plaintiff failed to file a timely tort claim notice under the TCA, we reverse the order reinstating those claims.

I.

The underlying facts of this appeal are largely undisputed. Plaintiff was a member of the color guard for the School's marching band, which was directed by plaintiff's father. In her complaint, filed on September 30, 2014, plaintiff alleged that during her junior year of high school, Smith began instant messaging her on a personal level and making "off-color" sexual jokes and comments. Over time, Smith's messages to plaintiff

---

[1] <u>Lopez v. Swyer</u>, 62 <u>N.J.</u> 267, 272 (1973) (requiring a hearing when "a plaintiff claims a right to relief from the bar of the statute of limitations by virtue of the so-called 'discovery' rule").

became more frequent and sexually explicit in nature. At some point, Smith obtained permission from plaintiff's father to stay at their house for the weekend. Plaintiff alleged that Smith raped her the first night he stayed at her home. Smith told plaintiff not to worry, that he would marry her when she turned eighteen, and that her father would approve of their relationship because he liked Smith enough to have hired him as assistant band director.

The complaint further alleged that:

> After the initial incident, [] Smith began to stay at [plaintiff]'s house often during the summer. [] Smith sexually abused plaintiff [] every time he stayed over in various locations of the house while plaintiff's parents were sleeping. Defendant [] would also abuse plaintiff once or twice during the week at school or while traveling at competitions by isolating her during walks together. Methods of abuse included, but were not limited to, vaginal penetration and oral sex.
>
> At some point later on, plaintiff fainted during [] drum corps. It turned out that plaintiff was pregnant. Subsequent to that notice, plaintiff had an abortion.

Pertinent to this appeal, plaintiff asserted a claim against the School seeking compensatory and punitive damages under the CSAA (count two). Plaintiff also asserted claims for delayed discovery/equitable estoppel (count seven); negligent hiring, supervision, and retention (count eight); negligent

entrustment and breach of fiduciary duty (count nine); breach of the statutory duty to report a reasonable suspicion of abuse (count ten); and endangering the welfare of children (count eleven) (collectively, the "common law" claims). In counts seven through eleven, plaintiff further alleged that, prior to September 11, 2014, she could not have reasonably ascertained the identity of the School as a party responsible for Smith's sexual abuse, or the harm that resulted from it.

Plaintiff's expert report, submitted in opposition to the School's motion for summary judgment, provides additional detail. In a September 11, 2014 report, psychologist Christine Hatchard indicated that she evaluated plaintiff at the request of her attorney on June 17 and 24, 2014. The purpose of the evaluation was "to determine when [plaintiff] realized that she was a victim of sexual abuse and how the trauma has affected her life." Dr. Hatchard noted that plaintiff had been seeing a psychotherapist since July 2011, and "that she finds therapy helpful and that her therapist knows of her abuse history and is supportive."

Plaintiff, then age thirty-one, told Dr. Hatchard that she was abused by Smith at age sixteen while a student at the School. Dr. Hatchard described plaintiff's recounting of the facts underlying the sexual abuse allegations as follows:

[Smith] . . . was hired for drumline and then was promoted to assistant band director, working directly under and closely with [plaintiff's] father . . . .

As percussion drum corps leader, [Smith] would chaperone band events, competitions, and trips, which [plaintiff] often attended as a member of the Color Guard . . . . [Smith] would instant message [plaintiff] . . . on a more personal level [by] making "off-color" sexual jokes and comments, frequently calling her "cutie," "hon," and other terms of endearment.

. . . .

In April, [Smith] asked [plaintiff's] father if he could stay at their house for a weekend and her father agreed . . . . On the first night that he was at her house, he led her to the first floor guest room where he was staying. She reports . . . that he pinned her beneath him and raped her. After the weekend was over, [Smith] emailed her saying "don't worry," "this will be okay, we'll get married when you're [eighteen]," and promising that her father would approve of the relationship since he liked [Smith] enough to hire him to teach for the marching band program.

After this initial incident, [Smith] stayed at [plaintiff's] house several weekends over the summer. He sexually abused her every time he stayed over in various locations of the house while her parents were sleeping or not at home. He would also abuse her once or twice during the week at school or while traveling at competitions by isolating her during walks together . . . . She noted all of the times that they engaged in sexual behavior in her journal/planner with a symbol, which the police allegedly made a copy of and subsequently lost.

6

In August, [plaintiff] fainted during a school performance and suspected she might be pregnant . . . .

In late August or early September, [plaintiff] told her mother that she was pregnant. Her mother verbally went through a list of names of potential fathers until she came to [Smith] and [plaintiff] nodded. Her mother took her back to the women's clinic for an abortion and would not pay extra money for [plaintiff] to be anesthesized during the procedure.

Afterward, . . . her father had a "staff meeting" with [Smith] in their house during which [plaintiff] . . . believed that [Smith] was encouraged to quit his job at her school.

[Plaintiff] went to the police with her parents, spoke to them about the sexual relationship and gave them her journal/planner where she had detailed the incidents of abuse. She reports that she returned one other time to the police department but that charges were never filed against [Smith]. Her parents also notified the school board. [Smith] insisted that he had nothing to do with [plaintiff's] pregnancy and her father believed him, accusing [plaintiff] of becoming pregnant from having sex with someone her own age.

Dr. Hatchard identified a number of negative consequences plaintiff experienced following the sexual abuse. These included: a decline in her grades; having to live in various locations including her car after her parents locked her out of their family home when she turned eighteen; a drug addiction fueled by numerous unhealthy relationships she maintained during

this period; impaired sexual relations; an inability to maintain a relationship with her step-son, her parents, or her sister; receipt of psychiatric treatment, which included detoxification from her opioid addiction; and individual psychotherapy once a week beginning in July 2011.

Dr. Hatchard noted that plaintiff "became tearful when discussing the aftermath of her sexual abuse, especially her parents' disbelief." The doctor explained:

> [Plaintiff] remembers feeling like she "just wanted [her] parents to believe [her] and acknowledge that [the sexual abuse] wasn't [her] fault," but they were silent about the abuse and no one talked about it again. [Plaintiff] felt like her "life was over," and she "didn't understand what she had done wrong."
>
> . . . . [I]n the summer of 2012, her father stated "I still don't believe you" [and] . . . her husband "freaked out". . . . Seeing her husband's anger provided her validation that she had not received from others in her life, and she began to have the thoughts that maybe the sexual relationship may have been abusive and not her fault, despite what she perceived as her parents' punishment.
>
> In 2013, [plaintiff] . . . spoke to a prosecutor who initiated a recorded phone call to [Smith] who confessed to the abuse around the week of July 4, 2013 . . . . Her parents only began to believe that she had been abused when they learned that he had confessed . . . .
>
> Several factors likely contributed to [plaintiff's] delay in fully understanding

that she was being sexually abused by [Smith] . . . . [Smith] was allowed into her home on a regular basis by her parents, who she trusted to protect her, which increased her confusion about experiencing abuse from a "safe" person.

Dr. Hatchard diagnosed plaintiff as suffering from (1) post-traumatic stress disorder (PTSD) (delayed expression); (2) persistent depressive disorder (with persistent major depressive episodes, moderate severity); and (3) opioid use disorder (severe). Dr. Hatchard ultimately concluded that:

> [Plaintiff] experienced significant difficulty identifying the abuse due to the manipulation and grooming behaviors by [] Smith who presented the abuse as a romantic relationship, and her parents repeated denial of the abuse and punishment of [plaintiff]. <u>She was only able to fully understand that the sexual relationship was abuse and that it had severe consequences, when [Smith] confessed to the crime in July [] 2013 and she finally received validation from the police as well as her parents</u> . . . . This new insight was marked by her development of [PTSD] in July [] 2013, which is when she began to directly acknowledge and confront the abuse. She . . . will require long-term psychiatric care, especially due to the delay in her healing process and the reinforced shame and guilt that she experienced as an adolescent and throughout her adulthood.
>
> [(Emphasis added).]

On June 2, 2014, prior to her first interview with Dr. Hatchard, plaintiff filed a notice of tort claim. The notice named the School, Smith, and others as responsible parties. It

specified that, from April 2000 through September 2000, Smith "systematically engaged in sexual acts with [plaintiff] . . . resulting in [her] pregnancy which was terminated when she was [seventeen] years old."

In February 2015, the School moved for summary judgment. It argued that the CSAA did not apply because the School was not in the same "household" as the plaintiff. It also sought dismissal of the common law claims as barred by the statute of limitations and the notice provisions of the TCA.

Plaintiff opposed the motion, contending that the CSAA applied because the School could be deemed a person standing in loco parentis within plaintiff's household. Plaintiff further argued that none of her claims accrued until September 11, 2014, the date of Dr. Hatchard's report. Plaintiff contended that this represented the date "when she was able to establish the causal relationship between the . . . sexual abuse perpetrated by [] Smith and the various mental and emotional harms she had and continues to suffer." Plaintiff argued that her tort claim notice was timely because it was submitted before the running of the statutory ninety-day limit. N.J.S.A. 59:8-8. She further argued that the statute of limitations was tolled by the discovery doctrine, and that the duress imposed upon her delayed her discovery of the sexual abuse and the common law claims.

The judge heard oral argument on March 20, 2015. In his oral opinion, the judge concluded that the CSAA did not apply to the School because the School did not fit the CSAA's definition of "within the household." The judge also found that plaintiff's remaining claims were barred by the statute of limitations and the notice provisions of the TCA. The same day, the judge entered a memorializing order granting the School's motion and dismissing all claims against it with prejudice.

In a telephone conference initiated sua sponte by the court on March 23, the judge expressed reservations with respect to his ruling on when plaintiff's claims accrued, and whether a Lopez hearing was needed to determine their accrual date. Plaintiff then timely moved for reconsideration, accompanied by an affidavit that was not previously submitted in opposition to the summary judgment motion.

In her April 1, 2015 affidavit, plaintiff provided additional details intended to establish that the School was "within the household" so as to trigger applicability of the CSAA. She averred that her father, who was the School's director of the marching band, drumline, and color guard, held a number of meetings and other activities at their family home where much of the sexual abuse had occurred.

Plaintiff further recounted that, in 2000, she attended a four-day drumline/color guard competition in Dayton, Ohio. In route, Smith intentionally chaperoned her bus and proceeded to touch her leg for long periods of time. While in Dayton, despite the requirement that girls and boys sleep in separate rooms, Smith awakened plaintiff in the middle of the night and informed her that her father wanted to see her. He then sexually assaulted her in a hallway. Plaintiff subsequently attended another trip to Canada, this time for a one-week period. On this trip, chaperones placed tape across the students' dorm rooms after curfew. Smith ripped the tape, brought plaintiff to his room, and sexually assaulted her.

In addition to assaulting her in her home and on overnight competitions, plaintiff's affidavit averred that Smith also sexually assaulted her on school grounds either prior to competitions or after practices. When she became pregnant in August or September of 2000, Smith told her to obtain an abortion, which she did in early September 2000. At some point thereafter, in compliance with school requirements, her father took her to file a police report. However, the police response was that "we couldn't ever prove it happened and my name and face would be smeared all over the newspapers." When asked if

12

she wanted to continue filing a report, plaintiff answered "no." She then dropped out of the color guard in November 2000.

The court heard argument on the reconsideration motion on June 26, 2015. Prior to the argument, plaintiff's counsel prepared and submitted a "time line" that he asked the court to accept and attach to plaintiff's reply brief. The judge again ruled that the CSAA did not apply. The judge found that many of the acts of sexual abuse occurred in plaintiff's own home, and that the "temporary and short-term [band and color guard] trips" were not "substantial enough to impart a 'household' status" to the School so as to bring it within the purview of the CSAA.

The judge then proceeded to reconsider the accrual issue with respect to plaintiff's remaining claims. Although the judge found that plaintiff "knew what was going on" back in 2000 when she became pregnant, and upon alerting the police in 2013, he nevertheless decided to conduct "a Lopez hearing to determine the tolling issue." On July 14, the court entered an order denying plaintiff's motion to reinstate count two, the CSAA claim. However, the order reinstated the common law claims asserted in counts seven through eleven, and directed that a Lopez hearing be scheduled to determine the accrual date of those claims. Both parties sought leave to appeal, which we granted on September 3, 2015.

## II.

On appeal, plaintiff argues that the trial court erred in finding that she was not entitled to the protection of the CSAA because the School did not qualify under the statutory language as a "person . . . within the household." Plaintiff also argues that all of her claims are entitled to the more liberal CSAA tolling provisions, and therefore none of them are time-barred by the TCA or the statute of limitations.

The School contends that, on reconsideration, the court erred in reinstating plaintiff's common law claims, and in relying upon documentary evidence not presented in opposition to the initial summary judgment motion. The School submits that a Lopez hearing is unnecessary, as the record already establishes that plaintiff's common law claims are time-barred by either: (1) her failure to file a timely tort claim notice; or (2) the two-year statute of limitations applicable to tort actions. Finally, the School urges us to affirm the trial court's finding that it was not "within the household" for purposes of establishing its liability as a passive abuser under the CSAA.

## III.

We begin with the standard of review that governs our analysis. "An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion

judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citing W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012); Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010)). We "identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Ibid. (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c)).

> [A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
>
> [Brill, supra, 142 N.J. at 540.]

We then decide "whether the motion judge's application of the law was correct." Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 231 (App. Div.), certif. denied, 189 N.J. 104 (2006). In this regard, "[w]e review the law de novo and owe no deference to the trial court . . . if [it has] wrongly interpreted a statute." Zabilowicz v. Kelsey, 200 N.J. 507, 512 (2009). Similarly, determining the date upon which a statute of limitations begins to run is an issue of law, subject to plenary review. Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013).

15

With respect to plaintiff's reconsideration motion, we note the grounds for reconsideration are limited. State v. Puryear, 441 N.J. Super. 280, 294 (App. Div. 2015). Reconsideration is appropriate only when "1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid. (alterations in original) (quoting Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010)). Reconsideration is not appropriate as a vehicle to bring to the court's attention evidence that was not presented, but was available, in connection with the initial argument. Fusco v. Bd. of Educ. of City of Newark, 349 N.J. Super. 455, 463 (App. Div.), certif. denied, 174 N.J. 544 (2002).

"[A] trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015). A court abuses its discretion "when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Ibid. (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

IV.

We first address the issue of whether the School qualifies as a "passive abuser" under the CSAA. The CSAA defines "sexual abuse" as "an act of sexual contact or sexual penetration between a child under the age of [eighteen] years and an adult. A . . . person standing in loco parentis within the household who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse . . . ." N.J.S.A. 2A:61B-1a(1). Thus, the statute imposes liability on both "active" and "passive" sexual abusers. Hardwicke v. Am. Boychoir Sch., 188 N.J. 69, 86 (2006).

In Hardwicke, the Supreme Court held that a private boarding school could be liable as a passive abuser under the CSAA. Id. at 94. There, the plaintiff alleged the Musical Director of the school abused him over the course of two years, and the school itself knew or should have known of the abuse. Id. at 74. The Court noted that in order to hold a passive sexual abuser liable under the statute, a plaintiff must demonstrate the defendant is: "(1) a person (2) standing in loco parentis (3) within the household." Id. at 86. The Court first found the boarding school was a "person" under the statute. Id. at 91. It next determined the school satisfied the role of "in loco parentis" because it

regulated the students' personal hygiene, monitored the cleanliness of their rooms, dictated the amount of money each student could have on campus, required students to write two weekly letters to friends or family, expected students to attend religious services when on campus during the weekend, provided transportation for recreational activities off school grounds, and disciplined students who violated those policies.

[Id. at 91-92.]

Finally, the Court considered whether the boarding school was a "household" under the statute. Id. at 93. The Court stated:

[T]he School provides food, shelter, educational instruction, recreational activities and emotional support to its full-time boarders - in other words, housing with the amenities characteristic of both a school and a home.

[Id. at 94.]

The Court thus concluded "the School [was] a 'person' standing 'in loco parentis' within a 'household.'" Ibid.

We reached a different result in D.M. v. River Dell Regional High School, 373 N.J. Super. 639 (App. Div. 2004), certif. denied, 188 N.J. 356 (2006). There, we affirmed the grant of summary judgment dismissing claims against a public

18

high school under the CSAA because the school did not qualify as "in loco parentis within the household."  Id. at 649.[2]

In Bryson v. Diocese of Camden, N.J., 909 F. Supp. 2d 364 (D.N.J. 2012), the United States District Court was called upon to interpret the applicability of the CSAA in light of controlling New Jersey case law.  The court concluded that defendant, a private Catholic school, "[did] not fit a reasonable definition of 'within the household'" for purposes of the CSAA.  Id. at 369.  In distinguishing Hardwicke, the court explained:

> If, as Plaintiff argues, neither a single roof nor a familial relationship is required to be "within the household," the Hardwicke decision suggests that a closely analogous, intimate relationship is required.
>
> In Hardwicke, the court found the boarding school to be "within the household" only after noting that the students were "full-time boarders" and depended on the school, in the absence of their parents or other care givers, for "amenities characteristic of . . . a home," including the basic necessities of life, such as food and shelter.  For practical purposes, the boarding school was "the household" of the plaintiff victim.  Here, Plaintiff resided

---

[2] We note that D.M. was decided shortly before Hardwicke and thus the panel in D.M. did not explain the application of the Hardwicke factors as they had not yet been announced.  We further note that shortly after Hardwicke was decided on August 8, 2006, the Court denied certification in D.M. on September 21, 2006, 188 N.J. 356, thus leaving the ruling in D.M. intact.

at all times with his parents, who provided him with home amenities, including food and shelter; he did not reside at the school as the plaintiff did in Hardwicke. Defendant educated and provided religious counseling to Plaintiff through [the active abuser] and others, and cared for Plaintiff a few hours per week after school. In doing so, Defendant provided services and amenities normally associated with those of a typical after-school program of a school or a church, not those of a home. Defendant did not function as a parent to Plaintiff in the same way the boarding school did in Hardwicke to the plaintiff in that case. [The active abuser] was not a member of the household, nor had he visited Plaintiff's home on more than one occasion. The qualities and characteristics of the relationship here are not sufficiently strong to establish that Defendant was within the Plaintiff's household.

[Bryson, supra, 909 F. Supp. 2d at 369-70 (internal citation omitted).]

In the present case, plaintiff argues that the motion judge erred when he held that the School was not liable for passive abuse under the CSAA because it was not "within the household." Plaintiff points to the overnight trips she took to Ohio and Canada, where the School provided meals, lodging, and supervision. She contends that the School provided her with food, shelter, educational instruction, recreational activities and emotional support, the same five elements that were deemed sufficient in Hardwicke to establish the School as a household under the CSAA. See Hardwicke, supra, 188 N.J. at 94.

We are not persuaded. Plaintiff's arguments overlook the fact that in Hardwicke the school provided those amenities and services to "its full-time boarders." Ibid. (emphasis added). That crucial element is lacking here. The Court in Hardwicke was clearly concerned not only with the role of the school as a parental substitute, but also with its role as the provider of amenities normally associated with a home environment for students who resided there full-time. Ibid.; see also J.H. v. Mercer Cnty. Youth Det. Ctr., 396 N.J. Super. 1, 14-15 (App. Div. 2007) (finding a youth detention center a household for the purposes of the CSAA). We are therefore satisfied that the term "within the household" connotes a degree of "residential" custody that is more than fleeting and temporary in nature and is simply not present in this case.

We are also satisfied the result we reach comports with basic principles of statutory construction. In construing a statute, "[o]ur task [] is to discern and give effect to the Legislature's intent." State v. Munafo, 222 N.J. 480, 488 (2015) (quoting State v. O'Driscoll, 215 N.J. 461, 474 (2013)). We first examine the "plain language of the statute." Ibid. (citing State v. Frye, 217 N.J. 566, 575 (2014); DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "When that language clearly reveals the meaning of the statute, the court's sole function is

21

to enforce the statute in accordance with those terms." State v. Olivero, 221 N.J. 632, 639 (2015) (quoting McCann v. Clerk of Jersey City, 167 N.J. 311, 320 (2001)).

Had the legislature wished to include a public day school within the scope of the CSAA, it could very easily have used the terminology "school or household." Also, "[t]he legislature could have omitted the phrase [within the household] and extended potential liability to all persons who stood in loco parentis of the victim. The legislature chose not to do so." Bryson, supra, 909 F. Supp. 2d at 370.

Summarizing, the CSAA's definition of passive sexual abuse limits the class of persons who are potentially liable to those "within the household." Because the School does not fit that definition, we affirm the dismissal of plaintiff's CSAA claim against the School.

V.

We next address the issue of whether plaintiff's remaining claims are barred by either the statute of limitations or the notice provisions of the TCA. Our analysis of this issue compels us to also determine whether a Lopez hearing is needed to establish the date that these common law claims accrued.

The School argues that plaintiff's claims "accrued" in August or September, 2000, when she terminated her pregnancy and

22                                                    A-0055-15T1

reported Smith's sexual abuse to her parents, the police, and School authorities. In that event, her claims are barred by the two-year statute of limitations in N.J.S.A. 2A:14-2, and the notice provisions of the TCA, N.J.S.A. 59:8-8. Even if the "discovery rule" applies, plaintiff's own expert concluded that plaintiff was aware of the abuse and its consequences by June or July, 2013. Accordingly, her tort claim notice, filed in June 2014, exceeded the ninety-day period within which notice must be given pursuant to N.J.S.A. 59:8-8. Since the record is clear, the School maintains there is no need to conduct a hearing to determine the accrual date of plaintiff's claims.

As noted, in her complaint and her argument before the trial court, plaintiff contended that all her claims accrued on September 11, 2014, the date her expert report was issued. Plaintiff argues that the CSAA's more liberal accrual provision[3] tolls the limitations period for her related common law claims. Additionally, plaintiff argues that "[t]he question of whether or not the statute of limitations is tolled is determined by the existence of either equitable grounds, duress and/or whether or

---

[3] See N.J.S.A. 2A:61B-1b ("In any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse.").

not [p]laintiff has 'repressed the memories' of [her] sexual abuse." N.J.S.A. 2A:14-21 (emphasis omitted).

Ordinarily, a cause of action accrues on the date upon which a wrongful act or omission producing the harm occurs. Beauchamp v. Amedio, 164 N.J. 111, 116 (2000). The pertinent statute of limitations, therefore, presumptively begins to run from the time of that wrongful conduct. Our courts have long recognized, however, that "in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered[,] that he [or she] may have a basis for an actionable claim." Lopez, supra, 62 N.J. at 272. This equitable principle, commonly known as the discovery rule, operates to "prevent the sometimes harsh result of a mechanical application of the statute of limitations." Martinez v. Cooper Hosp.-Univ. Med. Ctr., 163 N.J. 45, 52 (2000).

The discovery rule applies not only to situations where the injury has not been discovered, but also to situations where the injury is apparent, but it is not known "that it is attributable to the fault of another." Id. at 53. The cause of action does not accrue until both of these elements are known to the plaintiff. Ibid. In determining the date of a claim's accrual under the discovery rule, the court must assess "whether the

facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another." Id. at 52.

"The discovery rule is essentially a rule of equity. It has been said that in equity lies its genesis." Lopez, supra, 62 N.J. at 273. Courts must balance the desire to give innocent injured parties their day in court against the fairness to those who must defend stale claims. Id. at 274. With this balance in mind, the Supreme Court has held that, "[t]he decision [on accrual] requires more than a simple factual determination; it should be made by a judge . . . conscious of the equitable nature of the issue before him." Id. at 275. Among the equitable factors that may be relevant under Lopez are: (1) "the nature of the alleged injury," (2) "the availability of witnesses and [] evidence," (3) "the length of time that has elapsed," (4) the "deliberate or intentional" nature of the delay, and (5) whether the delay "peculiarly or unusually prejudiced the defendant." Id. at 276.

"Although the discovery rule does not require knowledge of a specific basis for legal liability or a provable cause of action, it does require knowledge not only of the injury but also that another is at fault." Guichardo v. Rubinfeld, 177 N.J. 45, 51 (2003) (quoting Martinez, supra, 163 N.J. at 52).

"Once a person knows or has reason to know of this information, his or her claim has accrued since, at that point, he or she is actually or constructively aware of that state of facts which may equate in law with a cause of action." Abboud v. Viscomi, 111 N.J. 56, 63 (1988) (quoting Burd v. N.J. Tel. Co., 76 N.J. 284, 291 (1978)). The fundamental question in a discovery rule case, therefore, is "whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another." Caravaggio v. D'Agostini, 166 N.J. 237, 246 (2001).

Here, plaintiff was undoubtedly aware of the abuse, Smith's identity as her abuser, and Smith's affiliation with the School, when she became pregnant in 2000. However, viewing the facts in the light most favorable to plaintiff as the non-moving party, as we must,[4] plaintiff arguably was unaware of the emotional effects of the sexual abuse at that time. In any event, the competent evidence before the court at the summary judgment stage,[5] as demonstrated by plaintiff's own expert psychologist, Dr. Hatchard, clearly establishes that by July 2013, plaintiff

---

[4] See R. 4:46-2(c); Brill, supra, 142 N.J. at 540.

[5] See Ji v. Palmer, 333 N.J. Super. 451, 463-64 (App. Div. 2000) (limiting appellate review of the grant of summary judgment to the record that existed before the motion judge).

was "able to fully understand that the sexual relationship was abuse and that it had severe consequences."

The motion judge originally dismissed plaintiff's claims as barred by the statute of limitations and the notice provisions of the TCA. On reconsideration, the judge determined that a Lopez hearing was necessary to establish the accrual date of plaintiff's common law claims. We conclude that the judge erred in determining that a Lopez hearing was necessary. A plaintiff who invokes the discovery rule is not always entitled to a hearing. "A Lopez hearing is only required when the facts concerning the date of the discovery are in dispute." Henry, supra, 204 N.J. at 336 n. 6 (citing Dunn v. Borough of Mountainside, 301 N.J. Super. 262, 274 (App. Div. 1997), certif. denied, 153 N.J. 402 (1998)). Here, it is undisputed that, no later than July 2013, plaintiff fully understood that she was abused and the consequences of that abuse.

Affording plaintiff the benefit of the discovery rule, we conclude that, no later than July 2013, a reasonable person, possessing plaintiff's knowledge, could have discovered a basis for a cause of action with the exercise of ordinary diligence. Using July 2013 as the accrual date of her claims, we further conclude that her September 2014 complaint was timely filed within the two-year statute of limitations.

We reach a different result, however, with respect to plaintiff's failure to comply with the TCA. Claims against the School are governed by the TCA, which "defines the extent of the Legislature's waiver of sovereign immunity and establishes the procedures by which claims may be brought[.]" D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 146 (2013) (alteration in original)(quoting Beauchamp, supra, 164 N.J. at 116). Under the TCA, a claimant must file a notice of claim within ninety days of the accrual of the cause of action. N.J.S.A. 59:8-8. N.J.S.A. 59:8-9 somewhat alleviates the rigidity of the ninety-day requirement by allowing a claimant to seek judicial permission to file late notice within one year after the accrual of the claim upon a showing of "extraordinary circumstances."

In N.J.S.A. 59:8-1, the TCA clarifies that, for purposes of the statute's notice and filing limitations, "[a]ccrual shall mean the date on which the claim accrued and shall not be affected by the notice provisions contained herein." Under the TCA, "the discovery rule is part and parcel" of determining when a claim accrued "because it can toll the date of accrual." Beauchamp, supra, 164 N.J. at 118. "Until the existence of an injury (or, knowledge of the fact that a third party has caused it) is ascertained, the discovery rule will toll accrual." Id. at 122. "However, once an injury is known, even a minor one,

the ninety day notice is triggered." Ibid. (emphasis added). "Worsening of that injury does not extend the time [to serve a notice] or otherwise alter the party's obligation." Ibid.; see also Maher v. Cnty. of Mercer, 384 N.J. Super. 182, 186 (App. Div. 2006).

Because we have concluded that plaintiff's claims accrued no later than July 2013, she was required to file her tort claim notice within ninety days of that time. She failed to do so. She also failed to seek permission to file a late claim within one year of the accrual of her claim. Plaintiff's failure to comply with the time requirement of N.J.S.A. 59:8-8(a) constitutes an absolute bar to recovery against the School. Karczewski v. Nowicki, 188 N.J. Super. 355, 357 (App. Div. 1982).

We briefly comment on the evidence submitted in support of plaintiff's motion for reconsideration. Plaintiff's affidavit, dated April 1, 2015, contained no new information that could not have been submitted in opposition to the School's summary judgment motion. Accordingly, its submission on reconsideration was inappropriate. Fusco, supra, 349 N.J. Super. at 463. In any event, it centered on plaintiff's claim under the CSAA that the School was "within the household," and provided no new

detail that could form the basis for reconsideration of when her claims accrued.

After her reply brief was filed, plaintiff's counsel also prepared and submitted a "time line" in support of her argument that her tort claim notice and her complaint were both timely filed. This submission suffers from the same infirmity as plaintiff's affidavit, as it contains information that could and should have been presented on the initial motion. Moreover, it was newly filed after plaintiff's reply brief and, as such, did not afford the School a meaningful opportunity to respond to it. Additionally, it was not accompanied by an affidavit or certification based on personal knowledge attesting to the accuracy of the information it contained, as required by Rule 1:6-6. Accordingly, the "time line," to the extent it may have been considered by the court, did not provide proper evidential support for plaintiff's reconsideration motion.

For these reasons, we conclude that plaintiff's failure to comply with the notice provisions of the TCA bars her common law claims against the School. No Lopez hearing was necessary to determine the date those claims accrued. We therefore reverse the order reinstating counts seven through eleven of plaintiff's complaint, which were properly dismissed on summary judgment.

A-0055-15T1

The portion of the July 14, 2015 order dismissing the CSAA claim is affirmed. The portion of the order that reinstated the common law counts and ordered a <u>Lopez</u> hearing is reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0055-15T1