**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4360-19

SUNWAY EQUITY, LLC, a
Limited Liability Company
organized and existing under the
laws of the State of New Jersey,
GLENN T. WERTHEIM, and
GAIL WERTHEIM,

      Plaintiffs-Appellants,

v.

SUBURBAN PROPANE, LP,
a Delaware Limited Partnership,
SOVEREIGN CONSULTING, INC.,
and BROCKERHOFF
ENVIRONMENTAL SERVICES,
LLC,

      Defendants,

and

JM SORGE, INC.,

      Defendant-Respondent.

_____

Argued November 15, 2021 – Decided January 12, 2022

Before Judges Sumners and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0458-17.

Glen J. Vida argued for appellants.

Patrick J. McCormick argued for respondent (Hardin, Kundla, McKeon & Poletto, attorneys; Patrick J. McCormick and Jenna K. Clemente, on the brief).

PER CURIAM

In this action arising from the environmental remediation of commercial property (the property) by defendant JM Sorge, Inc. (JMS), plaintiffs Sunway Equity, LLC (Sunway), Glenn T. Wertheim, and Gail Wertheim, who purchased the property from defendant Suburban Propane, LP (Suburban) about nine years after remediation was deemed completed, appeal the summary judgment dismissal of their complaint against JMS. We affirm the dismissal because: (1) the action was barred by the statute of limitations; and (2) if the action was not time-barred, JMS did not owe a duty to plaintiffs relative to its remediation of the property.

I.

As this is an appeal from summary judgment granted to defendant, our recitation of the facts is derived from the evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the

2

light most favorable to plaintiffs, and giving them the benefit of all favorable inferences. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013).

A.

Remediation

In 1991, Suburban retained JMS to remove three underground storage tanks containing gasoline, diesel, and waste oil, from its 1.7-acre property in Bridgewater Township. After the New Jersey Department of Environmental Protection (DEP) approved JMS's Underground Storage Tank Closure Plan on January 30, remediation work began on February 19. In August, JMS produced a Site Assessment Report detailing its work and investigations at the site.

After five years of JMS's remediation work, the DEP issued a May 20, 1996 letter to Suburban, stating, "no further action [was] required for the soils associated with" the "three separate Areas of Concern" where the tanks were previously located, but that additional groundwater testing for volatile organic compounds (VOC) contaminates was still necessary. On January 20, 1997, JMS submitted a Supplemental Investigation Report/Remedial Action Workplan to DEP that it prepared for Suburban. The report "confirmed that the subsurface soils" near the diesel tank excavation were contaminated with VOCs, which "appear[ed] to be the result of surficial discharges of gasoline and is not related

to the former operation of" the diesel tank. JMS "propos[ed] to remediate this relatively limited area of contaminated soil using standard excavation and removal techniques[,]" and then install a replacement monitoring well in the area "to assess the positive impacts of the proposed soil remediation efforts on local groundwater quality." The tank locations excavated covered a total of approximately 736 square feet, roughly one percent of the 1.7 acre, or 74,052 square feet, of the property.

In a July 24, 1997 letter to DEP, which was copied to Suburban, JMS reported it conducted "relatively small . . . excavation[s]" and soil tests "from around the outer perimeter of each excavation[,]" which revealed benzene, a VOC, at concentrations above DEP cleanup criteria, but "[n]o other [contaminants] were detected exceeding" the criteria.

Approximately ten months later, on April 8, 1998, JMS submitted a "Final Remedial Action Report [] and Classification Exception Area [(CEA)]Proposal" to the DEP. Referring to its supplemental investigation in 1996, JMS "proposed to remediate [a] relatively limited area of contaminated soil" and conduct additional groundwater sampling. Groundwater samples taken from the monitoring well adjacent to the former diesel tank excavation area showed a further decrease in the concentration of benzene, though still in excess of DEP

4

groundwater quality standards, and that neither of the other two wells "exhibited levels of groundwater contamination . . . consistently above" DEP standards.

On May 12, DEP issued Suburban a "NO FURTHER ACTION [(NFA)] Letter and COVENANT NOT TO SUE" where it "acknowledg[ed] the completion of a Remedial Investigation and Remedial Action pursuant to the Technical Requirements for Site Remediation (N.J.A.C. 7:26E)[,] for the former diesel fuel oil, gasoline[,] and waste oil underground storage tank Areas of Concern and no other areas." The NFA letter acknowledged that DEP "relied upon the certified representations and information provided to" it and that its determination was conditioned on Suburban Propane having not "withh[e]ld any information from" the DEP. The NFA letter imposed a CEA and well restricted area on the property, suspending the use of groundwater within the area for fourteen years or until Suburban demonstrated that benzene contamination no longer exceeded groundwater quality standards. Standards for all other substances remained in effect within the CEA. Suburban and its successors were also required to "conduct monitoring for compliance and effectiveness of [this] institutional control . . . and submit a certification to the [DEP] every two years in writing that the institutional control [was] being properly maintained."

B.

Property Sale

On February 8, 2000, Glenn,[1] who owned a lot adjacent to the property since August 1985, entered into a written contract (the contract) with Suburban to purchase the property "as is" for $285,000. According to the contract's paragraph six, Suburban "disclosed all known and suspected environmental conditions that may impact the [property], including but not limited to those conditions set forth in the January 1991 'Proposed Tank Closure Plan,'" and the 1991 "Site Assessment Summary Report" prepared by JMS and in the NFA letter, "as well as unconfirmed conditions set forth in verbal communications concerning possible burial of propane tanks and/or cylinders on the [property]." The paragraph also reflected that Glenn "agree[d] to assume and accept all obligations and responsibilities for said known and suspected environmental conditions."

In paragraph eight, Glenn was afforded the right to conduct "investigations, engineering tests, test borings, percolation and other soil and ground water tests, and any other tests as may be necessary to determine [the

---

[1] Because Glenn and Gail Wertheim have the same surname, we refer to them by their first names to avoid confusion. We mean no disrespect.

A-4360-19

property's] physical conditions which, in [his] sole discretion, will interfere with or prevent the transfer or use of the [property] for [which he] desired." It also gave him the right to terminate the contract if he "reasonably determine[d] that the physical condition of the [property was] in any way contaminated with any hazardous substance."

Under paragraph five, Glenn, "as of the [c]losing [d]ate," expressly waived all claims regarding the conditions of the "water, soil and geology[,]" or "any hazardous materials in, at, on, under or related to the [property]," unless he terminated the contract in accordance with his investigation and study of the property. Yet, the contract warned of "unconfirmed conditions set forth in verbal communications concerning possible burial of propane tanks and/or cylinders on the [property]" in addition to the "conditions set forth in the" 1991 reports (Underground Storage Tank Closure Plan and Site Assessment) and NFA letter.

Before the property's closing, Suburban provided plaintiffs with copies of the 1991 reports it received from JMS. Glenn received no other documentation from Suburban, thus plaintiffs asserted in discovery that their knowledge of known or suspected environmental conditions on the property "was limited to . . . the two 1991 reports and the NFA" letter. Significantly, he did not

exercise his right to have the property investigated or studied for environmental issues. Nor did he contact anyone at JMS prior to closing regarding its remediation work on the property, despite knowing JMS's owner "for a number of years" and having worked with him in the past.

Three days prior to the property's closing on April 11, 2000, the contract was amended to reflect that the property will be deeded to Gail, not Glenn. Plaintiffs said this was done "to avoid a premature merger of estates with the adjoining lot" Glenn owned.

C.

Property Conveyance to Sunway Equity/Contamination Discovery

Over ten years after the property was deeded to Gail, she conveyed it to Sunway Equity, which she and Glenn solely owned, on September 20, 2010. Within two days, the adjacent lot Glenn owned was consolidated with the property, and plaintiffs executed a land lease agreement with Wawa, Inc. for the property. At the time, the property was leased to Somerset Hills Towing for its offices and parking. That lease ceased in May 2015, and the property was turned over to Wawa for its development.

In February 2016, Wawa discovered the property was contaminated with various hazardous substances, including substantial quantities of arsenic.

8

Excavation work also found extensive steel piping in the soil near the former diesel tank excavation.

## D.

### Litigation

In April 2017, plaintiffs sued Suburban, JMS, Sovereign Consulting Inc. (Sovereign), and Brockerhoff Environmental Services, LLC (Brockerhoff). JMS was sued for negligence and violation of New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24. Only claims against JMS are relevant to this appeal.[2]

On November 29, the trial court granted JMS's summary judgment as to the Spill Act claims[3] but denied the motion without prejudice as to the negligence claim, to permit additional discovery.

On January 31, 2020, following the end of discovery, JMS refiled its motion for summary judgment to dismiss the negligence claim. On April 20, the court issued an order and oral decision granting summary judgment to JMS,

---

[2]  Plaintiffs' claims against other defendants were dismissed as follows: Suburban – negligence, breach of contract, and equitable fraud claims were dismissed with prejudice but claims under the Spill Act were dismissed without prejudice; Brockerhoff – all claims were voluntarily dismissed without prejudice; and Sovereign – all claims were voluntarily dismissed with prejudice.

[3]  The dismissal of these claims is not being appealed.

holding plaintiffs' negligence claim was barred by the statute of limitations and JMS did not owe a duty to plaintiffs.

## II.

Plaintiffs appeal the April 20 summary judgment order, arguing:

POINT I

[JMS] HAD A DUTY TO PLAINTIFF[S].

POINT II

THE PLAINTIFF[S] HA[VE] A VIABLE ACTION AGAINST [JMS] FOR NEGLIGENCE.

POINT III

PLAINTIFF[S'] ACTION IS NOT TIME BARRED.

We review the trial court's decision on a summary judgment motion de novo. Giannakopoulos v. Mid State Mall, 438 N.J. Super. 595, 599 (App. Div. 2014). We utilize the same standard as the court and consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

A.

Initially, we address plaintiffs' challenge to the summary judgment dismissal of their negligence claim because it is time-barred. They do not dispute that the six-year statute of limitations under N.J.S.A. 2A:14-1 applies to their claim. Rather, they argue their cause of action did not accrue until February 2016, when Wawa discovered the property was contaminated, because JMS's negligence was "camouflaged by the NFA letter, the CEA[,] and the incomplete set of documents submitted by Suburban[,]" which "together concealed the [contamination] from" them. We are unpersuaded.

The running of the statute of limitations begins when the plaintiff is aware "through the exercise of reasonable diligence, the facts that form the basis for an actionable claim against an identifiable defendant." The Palisades at Ft. Lee Condo. Ass'n, Inc. v. 100 Old Palisade, LLC, 230 N.J. 427, 435 (2017) (citing Caravaggio v. D'Agostini, 166 N.J. 237, 246 (2001)). "[T]he burden [is] on the plaintiff seeking application of the discovery rule to show that a reasonable person in her [or his] circumstances would not have been aware, within the prescribed statutory period, that she [or he] had been injured by [the] defendant[']s" conduct. Kendall v. Hoffman-La Roche, Inc., 209 N.J. 173, 197-98 (2012). "The discovery rule is essentially a rule of equity," taking into

11

consideration fairness to the plaintiff and the defendant. Lopez v. Swyer, 62 N.J. 267, 273 (1973). A hearing is necessary when there is a factual dispute concerning the date of the discovery. J.P. v. Smith, 444 N.J. Super. 507, 528 (App. Div. 2016). The trial court's determination of "whether a cause of action is barred by a statute of limitations is a question of law that we review de novo." Save Camden Pub. Schs. v. Camden City Bd. of Educ., 454 N.J. Super. 478, 487 (App. Div. 2018) (citing Catena v. Raytheon Co., 447 N.J. Super. 43, 52 (App. Div. 2016)).

We reject plaintiffs' contention that the tolling of the statute of limitations started in February 2016, when Wawa's investigation uncovered contaminants in the property. The clock began on April 11, 2000, when Gail took ownership of the property and plaintiffs reasonably could have known of its contamination had they exercised due diligence. The contract to buy the property from Suburban put plaintiffs on notice that it had preexisting environmental issues. The 1991 Site Assessment Report and the NFA letter given to Glenn by Suburban did not represent that the entire property was examined and found to be uncontaminated. The documents clearly stated that JMS's remediation plan was limited to the removal and clean-up associated with the three underground tanks—covering one percent of the property's total area—and nothing else. JMS

did not withhold any information relevant to its work which hampered plaintiffs' ability to determine whether the property was contaminated. Any deficiency of the documentation provided to plaintiffs did not affect the running of the statute of limitations; it was their failure to exercise due diligence by not asking for the documentation they now claim Suburban did not provide.

The contract permitted Glenn to obtain all JMS and DEP records pertinent to JMS's remediation in Suburban possession, to have the property professionally investigated, and to terminate the contract without liability if harzardous conditions were found on the property. There is no equitable basis to toll the six-year statute of limitations period until February 2016, almost sixteen years after Gail took ownership of the property in April 2000. Simply put, plaintiffs' conduct was unreasonable by failing to exercise contractual rights to obtain all the property's pertinent environmental records and conduct an investigation regarding the property's environmental condition.

We see no merit in plaintiffs' argument that the court erred in not conducting a plenary hearing regarding the discovery of the property's contamination. There was no factual dispute as to their lack of due diligence in uncovering the property's contamination before they acquired the property.

A-4360-19

Plaintiffs do not identify any specific material disputed fact or reasonable inference denied to them that alters our reasoning.

Having concluded the statute of limitations commenced on April 11, 2000, plaintiffs had six years thereafter to file suit against JMS. They did not do so until April 2017, which was too late. Hence, the court properly granted summary judgment dismissal of plaintiffs' complaint as time-barred.

B.

Although we have concluded plaintiffs' negligence claim was properly dismissed as being time-barred, for the sake of completeness, we also address the court's finding that the claim should also be dismissed because JMS owed no duty to plaintiffs with respect to its remediation work at the property. Plaintiffs argue it was reasonably foreseeable buyers of the property would rely on the NFA letter and the 1991 reports in deciding to purchase the property, and therefore, if JMS's reports were "negligently generated, incomplete[,] and misleading," injury to them as subsequent buyers of the property was also reasonably foreseeable. They maintain that failing to impose a duty on JMS here would mean that "[a]ll prior investigations would have to be repeated with each succeeding transaction[,]" imposing a considerable economic burden on the sale of real estate. They also argue that it would "curtail the reliance by

14

subsequent hydrogeologists and [licensed site remediation professionals (LSRPs)] upon the existing database at the DEP[,]" which in turn would make "environmental compliance . . . chaos." We do not favor these arguments.

In a negligence action, a plaintiff has the burden to prove a defendant owed him or her a duty of care that was breached, which was the proximate cause of injury. D'Alessandro v. Hartzel, 422 N.J. Super. 575, 579 (App. Div. 2011). Whether a duty exists is a matter of law decided by the court, not the factfinder. Siddens v. Cook, 382 N.J. Super. 1, 8 (App. Div. 2005) (citing Rogers v. Bree, 329 N.J. Super. 197, 201 (App. Div. 2000)). Similar to application of the above noted statute of limitations discovery rule, whether a duty of care exists is a question "of fairness and policy that implicates many factors." Carvalho v. Toll Bros. & Devs., 143 N.J. 565, 572 (1996). "The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care." Ibid. However, the foreseeability of "injury to a potential plaintiff does not in itself establish the existence of a duty." Ibid. (quoting Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc., 135 N.J. 182, 194 (1994)).

"Once the foreseeability of an injured party is established, . . . considerations of fairness and policy govern whether the imposition of a duty is

A-4360-19

warranted." Id. at 573 (alteration in original) (quoting Carter Lincoln-Mercury, Inc., 135 N.J. at 194-95). In considering the fairness and policy implications of imposing a duty, courts identify, weigh, and balance four factors: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Ibid. (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)). "[W]hereas the foreseeability inquiry is rooted in the specific facts of a particular case, the fairness and policy inquiry focuses on the ability to derive from those facts a general rule that can 'sensibly, predictably, and fairly govern future conduct.'" Coleman v. Martinez, 247 N.J. 319, 342-43 (2021) (quoting Est. of Desir ex rel. Estiverne v. Vertus, 214 N.J. 303, 330 (2013)).

Even where a person did not hire a professional, a duty of care may be imposed on an injured third party who reasonably and foreseeably "relied upon the representation of the professional." Rezem Fam. Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 121 (App. Div. 2011) (quoting Zielinski v. Pro. Appraisal Assocs., 326 N.J. Super. 219, 226 (App. Div. 1999)). Thus, in Petrillo v. Bachenberg, 139 N.J. 472, 486-89 (1995), the Court held the attorney of a seller of real estate owed a duty of care to the buyer for a misleading report of percolation tests produced by the attorney which did not fully detail the number

16

of failed percolation tests that the attorney knew or should have known the buyer would rely upon on in purchasing the property. However, for different reasons, we held in Zielinski, it was unfair to impose a duty of care upon an appraiser to the buyer of a property where the appraisal was for the lender and not seen by the buyer, because it was not an opinion of the property's condition to be reasonably relied upon by the buyer regarding the property's defects. 326 N.J. Super. at 224-26. Moreover, the appraisal contained a "disclaimer regarding structural and engineering defects." Ibid. at 227.

Plaintiffs never saw the 1998 report on which DEP expressly relied upon in issuing the NFA letter. It was unreasonable for them to solely rely on the NFA letter to not conduct their own environmental investigation of the property when the letter expressly applied only to the "underground storage tank Areas of Concern." Prior to the property's closing, they did not obtain or ask for the attachments to the 1991 site assessment report, which Suburban provided them. Had they done so, they would have been aware of the arsenic finding and disposal of hazardous soil that were mentioned in those attachments. JMS was not responsible for them not receiving all its remediation-related reports. Nevertheless, based on the documentation plaintiffs received prior to closing, they knew JMS's limited remediation was successful, but they still should have

17

reasonably concluded it was necessary to retain an environmental consultant to investigate the property's condition.

Unlike the attorney in <u>Petrillo</u>, JMS's opportunity to exercise care to avoid reliance on their work product was limited. Nothing here suggests that JMS was responsible for plaintiffs not receiving all of JMS's reports, as was the situation in <u>Petrillo</u>. JMS's duty stopped was limited to sending all of its reports and correspondence to Suburban. And while the attorney in <u>Petrillo</u> "should have foreseen that [the plaintiff] would rely on the total number of percolation tests" reflected in the composite report he submitted to the broker, 139 N.J. at 487, JMS could not have foreseen reliance on any particular combination of incomplete documents that Suburban decided to submit to a buyer, or on the resulting nondisclosure of facts that JMS disclosed to Suburban and DEP.

Furthermore, there is no fairness or policy interest in imposing a duty of care on JMS. Finding a duty would unreasonably disregard any reliance on documented remedial actions and NFA letters. A buyer who purchases a property with a known history of contamination "as is" and without any independent investigation, in reliance on a facially incomplete record of remediation and an NFA letter that applies only to a portion of a property, does

so at his or her own risk. As this describes plaintiffs' conduct, they should not be able to pursue negligence claims against JMS.

Although the dismissal of plaintiffs' Spill Act claims are not being appealed, the act is relevant to evaluating the fairness or policy interest. It provides the owner of a contaminated property can avail themselves of an "innocent purchaser" defense and avoid liability for cleanup and removal costs by showing that: (1) "the person acquired the real property after the discharge" occurred; (2) "at the time the person acquired the real property, the person did not know and had no reason to know that any hazardous substance had been discharged at the real property"; (3) "the person did not discharge the hazardous substance [and] is not in any way responsible for the hazardous substance"; and (4) "the person gave notice of the discharge to [DEP] upon actual discovery of that discharge." N.J.S.A. 58:10-23.11g(d)(2). "To establish that a person had no reason to know that any hazardous substance has been discharged . . . the person must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property[,]" which in turn requires "the performance of a preliminary assessment, and site investigation, if the preliminary assessment indicates that a site investigation is necessary." Ibid.

Because plaintiffs did not conduct their own environmental assessment of the property, they cannot claim they were innocent purchasers under the Spill Act, nor can they seek invocation of comparative negligence to avoid summary judgment. Consequently, there is no fairness or policy reason to impose any duty on JMS, which remediated the property and obtained an NFA letter in accordance with its duty to Suburban, with respect to plaintiffs.

To the extent we have not addressed any remaining issues, we find they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION