Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/03/2017 09:08 AM CST

Douglas County, Nebraska, a political subdivision
of the State of Nebraska, appellant, v.
Daniel Archie and the Douglas County
Civil Service Commission, appellees.

___ N.W.2d ___

Filed February 3, 2017.    No. S-15-322.

1. **Administrative Law: Appeal and Error.** In reviewing an administrative agency decision on a petition in error, both the district court and the appellate court review the decision to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency.

2. **Administrative Law: Evidence.** The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it.

3. **Administrative Law: Appeal and Error.** The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact.

4. **Administrative Law: Judgments: Words and Phrases.** An administrative agency decision must not be arbitrary and capricious. Agency action is "arbitrary and capricious" if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion.

5. **Judgments: Appeal and Error.** Appellate courts independently review questions of law decided by a lower court.

6. **Administrative Law.** The interpretation of regulations presents questions of law.

7. **Administrative Law: Judgments.** Whether an agency decision conforms to the law is by definition a question of law.

8. **Civil Service: Administrative Law: Appeal and Error.** A civil service commission acts in a judicial manner when deciding employee appeals.

9. **Judgments: Records: Appeal and Error.** The purpose of a proceeding in error is to remove the record from an inferior to a superior tribunal so that the latter tribunal may determine if the judgment or final order of the inferior tribunal is in accordance with law.

10. **Administrative Law: Appeal and Error.** The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact.

11. **Administrative Law: Words and Phrases.** Agency action taken in disregard of the agency's own substantive rules is arbitrary and capricious.

12. **Administrative Law: Appeal and Error: Words and Phrases.** A review using the "arbitrary and capricious" standard requires considerable deference to the judgment and expertise of the agency.

13. **Administrative Law: Judgments: Words and Phrases.** A decision is arbitrary and capricious if the agency has relied on factors that the Legislature has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

14. **Administrative Law: Evidence: Appeal and Error.** The proper inquiry for an appellate court when reviewing the decision of an administrative agency on a petition in error is whether there was sufficient, relevant evidence to support the conclusion that the agency did make and not whether the evidence would support a contrary conclusion.

15. ____: ____: ____. When reviewing a decision of an administrative agency, as in reviewing a jury verdict, if there is sufficient evidence to support the decision, the reviewing court must affirm even if it may be of the opinion that had it been the trier of the case, it would have reached a different conclusion.

16. **Courts: Appeal and Error.** On a petition in error, the district court acts in an appellate capacity and employs the same deferential standard of review that an appellate court uses.

Petition for further review from the Court of Appeals, MOORE, Chief Judge, and IRWIN and BISHOP, Judges, on appeal thereto from the District Court for Douglas County, MARLON A. POLK, Judge. Judgment of Court of Appeals reversed, and cause remanded with directions.

Donald W. Kleine, Douglas County Attorney, Meghan M. Bothe, and Timothy K. Dolan for appellant.

Rick G. Wade, of Norby & Wade, L.L.P., for appellee Daniel Archie.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

WRIGHT, J.
## I. NATURE OF CASE

Douglas County Youth Center (DCYC) terminated Daniel Archie's employment. Archie brought an administrative appeal to the Douglas County Civil Service Commission (the Commission). Following an evidentiary hearing, the Commission reversed the termination and ordered that Archie be reinstated. Douglas County filed a petition in error with the district court. The district court affirmed the Commission's order. Douglas County then appealed to the Nebraska Court of Appeals. In a split decision, the Court of Appeals reversed the district court's affirmance of the Commission's order. We granted Archie's petition for further review.

In the case at bar, our decision is controlled by our standard of review. We examine the decision of the Commission to determine whether there was sufficient, relevant evidence to support its decision that Archie should be reinstated and whether the decision was arbitrary and capricious. In light of the deference that our standard of review requires us to give the Commission's decision, we now reverse the order of the Court of Appeals and remand the cause with directions to affirm the judgment of the district court which affirmed the order of the Commission.

## II. BACKGROUND

In February 2003, Archie was hired by DCYC as a juvenile detention specialist. Just over a year later in May 2004, he was hired as a physical education teacher at DCYC. Archie worked for over 11 years at DCYC, and by all accounts in the record, he was an exemplary employee at DCYC. According to DCYC superintendent Brad Alexander, Archie was a good employee

with an excellent work history. Former DCYC detention manager Robert Bryant, who knew Archie in his roles as a juvenile detention specialist and a physical education teacher, described him as a "model employee" who was "very professional" and had an "excellent work relationship with not only the kids but the staff [and] supervisor[s]." Bryant stated that Archie's direct supervisor told Bryant that "Archie was above and beyond" and that "he wished all his teachers [were] like Archie."

## 1. TERMINATION OF
## ARCHIE'S EMPLOYMENT

In August 2014, Alexander received a telephone call from a woman claiming to have information about Archie. She said that her daughter had been a student at Omaha South High School (Omaha South) when Archie was a teacher there prior to his employment at DCYC. She stated that Archie and her daughter had engaged in a sexual relationship and that she had an audio clip to substantiate her claims. Alexander asked for and received a copy of the clip.

The audio clip was a 4-minute segment of a telephone conversation that took place in August 2014 between the former student and Archie, apparently recorded without Archie's knowledge. In the clip, Archie did not dispute that there had been a sexual relationship between him and the former student, but he did dispute whether the relationship began before she graduated from high school. The policy of Omaha Public Schools (OPS), Archie's employer at the time, prohibited sexual relationships between a teacher and former student within 2 years of that student's enrollment.

After Alexander listened to the audio clip, he placed Archie on paid administrative leave and issued him a predisciplinary hearing notice. The notice alleged that Archie violated the Commission's personnel policy manual (the Manual), article 22, § 5(13) and (19). A predisciplinary hearing was held, which Archie attended with his attorney. After the hearing, DCYC terminated Archie's employment.

The two reasons given were that Archie had violated the Manual, article 22, § 5(19), "Has engaged in criminal, dishonest, immoral, or notoriously disgraceful conduct, which is prejudicial to the county or to [the] County's reputation," and § 5(13), "Falsification, fraud or intentional omission of required information on the employment application/resume." The subsection (19) violation was based on Archie's relationship with the former student. The subsection (13) violation was based on Archie's failure to include the full reason behind leaving OPS on his job applications with DCYC. The reasons given by Archie for leaving OPS were "spend time w/ kids" and "Family."

The notice of termination stated that Archie had engaged in a sexual relationship with a former student while she was a senior in high school. It also stated that Archie was under administrative leave and under investigation by OPS when he first applied at DCYC and that his two DCYC applications contained "willful misrepresentation."

## 2. Archie's Appeal to the Commission

Archie appealed the termination of his employment to the Commission. Douglas County called the former student, her mother, Archie, and Alexander to testify. Archie called former DCYC detention manager Bryant. Documentary evidence was also admitted, including Archie's DCYC applications, a letter from OPS to Archie, the audio clip, a reprimand from the Nebraska Board of Education, the predisciplinary hearing notice, and the notice of termination.

The Commission admitted a letter addressed to Archie, dated shortly before his resignation, from OPS' assistant superintendent for human resources. The letter, dated January 3, 2003, states:

Dear Mr. Archie:

On November 15, 2002, subsequent to investigation of allegations of misconduct made against you that you had engaged in a sexual relationship with a former student

within two years of that student's enrollment in [OPS], I recommended that your contract with [OPS] be cancelled for engaging in such a relationship and for lying to me as to your whereabouts on October 10, 2002, the date it was alleged you were found with the student in a potentially compromising sexual situation.

Based upon advice from legal counsel, after their review of [OPS] files and witness interviews, that there is insufficient evidence upon which the Board could rely that you were in a compromising sexual situation on October 10, 2002, I am withdrawing my recommendation that your contract be cancelled for said action.

However, the fact remains that there is clearly admissible and persuasive evidence that you did lie about your whereabouts during the time period in question. Accordingly, the administration will proceed with the hearing you requested before the Board of Education as previously scheduled on January 9, 2003, unless a letter of resignation has been received from you prior to such date.

Archie testified that when he received this letter, he believed the investigation into his relationship with the former student had been completed and believed the only ongoing investigation at the time of his resignation was of whether he had lied about his whereabouts on October 10, 2002. On January 6, 2003, he submitted his resignation, which was accepted by OPS on January 9. He explained that at the time he first applied at DCYC, there was no investigation ongoing and he was not on administrative leave, because he had previously resigned.

Archie testified that he resigned rather than going through with the hearing in order to spare his children from the negative rumors and attention that the situation would bring. He testified he resigned because he did not feel like OPS was listening to his side of the story and because of the "whole situation." He did not think that he would lose his job for lying

about his whereabouts, but resigned because of the rumors and because "it was the easiest thing to do." He believed he was being accurate and honest when he wrote on his application that he left OPS to "spend time w/ kids." Since he had been the head basketball coach, Archie assumed that people at DCYC knew about the situation surrounding his leaving Omaha South.

Archie testified that he had received a public reprimand from the Nebraska Department of Education in November 2003 and was no longer under investigation when he applied for the physical education teacher position at DCYC in May 2004. The reprimand was issued for lying about his whereabouts during the OPS investigation. He explained that the DCYC physical education teacher application did not ask about prior investigations or reprimands and that therefore, he did not describe his reprimand. He testified that when he had applied for other positions as a public school teacher and the applications did inquire about reprimands, he did set forth that he had received a reprimand and described the surrounding circumstances.

The Commission admitted the audio clip of the telephone conversation between Archie and the former student. Archie testified that the 4-minute clip, from August 2014, was part of a 30-minute conversation and that hearing the conversation in its entirety "would help out tremendously." In the clip, Archie did not deny that the two engaged in a sexual relationship or that it occurred when she was 17, but he did dispute that it occurred before her graduation.

Testifying before the Commission, Archie was asked, "Okay. So are you denying that you had a relationship with her at all?" Archie replied, "Absolutely." This denial occurred shortly after a series of questions and answers about whether the relationship occurred during the school year. Archie denied that the relationship occurred while the former student had been a student at Omaha South. Archie admitted that a sexual relationship occurred between him and the former student

sometime after her graduation: Asked "Did you engage in sexual activity with [the former student] when she was in high school," Archie replied, "No I did not." Asked "At some time after she graduated you did engage in sexual activity with her," Archie replied, "Yes I did."

Archie testified that the former student would call him when she needed someone to talk to. The frequency of the contact had increased in the past 5 years because "she was determined that . . . she was going to do whatever it took to be with me." In July 2014, he tried to cut off contact with her. Archie testified that after the conversation in August 2014 (from which the audio clip was recorded), he did not know if she was going to try to harm him, because "she was saying so many different things." He said, "She threatened . . . to take me to court and . . . [t]hat she would do whatever it takes to take me down so that she could get rid of her love that she had for me because that's what she had to do." Archie testified that she told him, "You're going to be with me," and that "she was determined that that was going to happen . . . at all costs. No matter what."

The former student, now 31 years old, testified that she was a student at Omaha South from 1998 to 2001. She knew Archie because he was her physical education teacher. She could not recall what age she was when the relationship began, either 16 or 17, or what grade in school she was, either a junior or a senior, but she was sure that she was a student at the time. She said that she did not cooperate with OPS' investigation into the allegations about her relationship with Archie. She said that the reason she did not cooperate was because she "was manipulated and mentally . . . wasn't able to make good sound decisions."

The former student testified that she had gone to great efforts to keep in contact with Archie in the years after the relationship. She testified that in the prior year, she had gone to Archie's workplace and waited for him in the parking lot and had done so on multiple occasions. She said that Archie

had moved and would not tell her where he lived. He changed his telephone number and would not give her his number. She testified that in August 2014, she called him late at night even though she was involved romantically with someone else, and that she still wanted Archie to be with her.

Her mother testified that she first became aware of the relationship when an OPS human resources manager asked whether she had heard anything about a relationship between her daughter and Archie. She confronted Archie about the rumor, and he denied it. She testified that in October (she could not remember the year), she went to her daughter's father's house and found Archie there with her daughter. She reported this to OPS. She later said that this occurred in 1999 and that her daughter was a junior at the time. The letter from OPS to Archie indicates that this event actually occurred in October 2002, more than a year after the former student had graduated in 2001. The mother also explained the 11-year delay in contacting DCYC by saying that she needed her daughter "to be the driving force behind holding him accountable for his actions" and that her daughter "finally woke up."

Alexander testified that he supervised the hiring decisions at DCYC, but did not sit in on every job interview. He admitted that, contrary to the notice of termination, Archie was not actually under investigation by OPS at the time he first applied to DCYC on February 4, 2003. He testified that at the time of Archie's hiring, he was not aware of the rumors about Archie. He said that he would not have hired Archie if he had known about the whole situation at Omaha South. He testified that during the predisciplinary hearing, Archie said that his reason for resigning from Omaha South was to spare his children from the embarrassment of the rumors about Archie. Alexander agreed that protecting his children from rumors was part of Archie's reason for resigning from OPS.

Alexander explained that applicants would sometimes list "personal" as their reason for leaving prior employment on a job application. He said that if a person lists spending time

with kids or family as the reason, it is "fairly clear" that means the reason is personal. This type of reason on an application prompts a followup question in the interview to gain a better understanding of the reason.

Alexander could not remember whether Bryant had told him about the situation leading to Archie's resignation at Omaha South, nor could he remember any conversations between the two about Archie's hiring at DCYC. He was certain, however, that Bryant would have been involved in Archie's hiring as the detention manager.

Bryant oversaw the day-to-day operations of DCYC, including making hiring decisions; oversaw the supervisors; and reported to Alexander. He testified that he made the decision to hire Archie as a juvenile detention specialist at DCYC. Bryant knew Archie for 3 or 4 years before Archie applied at DCYC, from when Bryant was a basketball official and Archie was a basketball coach at Omaha South. While officiating a game at Omaha South, he was told that Archie had resigned "due to something that happened with a former student." Bryant later encouraged Archie to apply for the open juvenile detention specialist position at DCYC.

Before hiring Archie, Bryant let Alexander know that "Archie resigned from [Omaha] South . . . due to something with a former student." He recalled Alexander's saying something like, "Give him a shot." Bryant also agreed that listing "spend time w/ kids" as the reason for leaving a prior job on an application could mean that the reason is personal or that applicants wanted to avoid exposure for their kids. He said, "[W]hen you see things like spending time with kids [on an application], you know there's some issues there."

Near the end of the hearing, the Commission asked whether DCYC was subject to the Prison Rape Elimination Act (PREA) guidelines; Alexander replied that it was. After the final witness testified, the Commission delayed making a decision "until [the] issue of whether . . . Archie would be able to be employed at [DCYC] pending a review of PREA and any other

similar applicable rules and regulations." The Commission resumed on November 25, 2014, and noted that its members had reviewed the PREA juvenile facility standards and a PREA frequently-asked-questions document.

The Commission voted 3 to 0 to reverse the decision of DCYC to terminate Archie's employment and "for him to be made whole as of August 29, 2014."

After the Commission made its decision, Douglas County requested that the Commission include specific findings of fact and conclusions of law in its order, which request the Commission denied.

### 3. Douglas County's Appeal to District Court and Court of Appeals

Douglas County filed a petition in error with the district court for Douglas County. The district court affirmed the Commission's order. Douglas County appealed from the district court to the Court of Appeals. The Court of Appeals reversed the decisions of the district court and the Commission and ordered that the termination of Archie's employment be reimposed.[1] Judge Bishop dissented. The majority concluded that "the district court's order was arbitrary, capricious, and unsupported by sufficient, relevant evidence."[2]

The majority found that Archie's testimony, which it characterized as "contradictory," could not be accepted in light of the rest of the evidence.[3] It concluded that "no reasonable and honest person could reach the conclusion of the district court that Archie's behavior was not a violation of [a]rticle 22, § 5(19)" of the Manual.[4]

---

[1] *Douglas County v. Archie*, No. A-15-322, 2016 WL 3964767 (Neb. App. July 19, 2016) (selected for posting to court website).

[2] *Id*. at *1.

[3] *Id.* at *5.

[4] *Id*. at *6.

It concluded that "the evidence was legally insufficient to support the district court's conclusion that Archie's conduct was not a violation" of article 22, § 5(13), of the Manual, and it found that "Archie's reason for leaving OPS was broader than"[5] the reasons provided on his applications.

The majority also dismissed the fact that DCYC mistakenly believed—as it stated in its notice of termination—that Archie was under active investigation by OPS and on administrative leave when he first applied at DCYC. It concluded that "the exact dates of the investigation are immaterial to the larger question of whether Archie's statements constitute '[f]alsification, fraud or intentional omission.'"[6] It found that regardless of the timing, Archie's "failure to mention the situation with the student as a reason for leaving his OPS job was nevertheless an 'intentional omission of required information.'"[7] The majority found that the evidence was legally insufficient to support the conclusion that Archie had not violated subsection (13). It concluded that "no reasonable person could determine that Archie's termination was not warranted under both [a]rticle 22, § 5(13) and (19)."[8]

Finally, the Court of Appeals did not consider Douglas County's assignment of error that the Commission had exceeded its statutory authority by considering matters outside the record, specifically the materials on the applicability of the PREA. The Court of Appeals did not reach this issue because of its disposition in Douglas County's favor on its first assignment of error.

In her dissent, Judge Bishop reasoned:

> [T]he district court's and this court's standard of review requires giving the Commission considerable deference by limiting our review to whether or not there is

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id*. at *7.

sufficient, relevant evidence to support the Commission's decision, and to ensure its decision is not arbitrary or capricious. Contrary to that limited standard of review, the majority instead seems to rely on its own interpretation of some of the evidence which the majority suggests supports DCYC's decision to terminate Archie's employment. However, our standard of review does not permit us to reverse the Commission's decision simply because there is evidence that may support a different outcome. Rather, like the district court, our role is only to determine whether there is sufficient evidence to support the Commission's decision.[9]

The dissent pointed out that the job applications contained a notice warning applicants that the applications may be considered public records and be publicly available. And this "would certainly give an applicant pause about providing personal details on the application."[10] Alexander testified that there had been other instances in which applicants had stated "personal" as their reason for leaving a prior job. Alexander indicated that providing the reason "spend time w/ kids" or "Family" would mean the reason is personal. The dissent reasoned that "[s]ince writing 'personal' as an explanation for leaving a former job is not an intentional omission of required information, it seems incongruous that writing 'spend time w/kids' is somehow so substantially different from writing 'personal' that it constitutes an intentional omission of required information . . . ."[11]

The dissent also noted that DCYC's termination of Archie's employment appeared to be based on erroneous information. In its notice of termination, DCYC stated it believed that Archie had conceded the relationship occurred while

---

[9] *Id.* at *8 (Bishop, Judge, dissenting).

[10] *Id.* at *12.

[11] *Id.*

the former student was at Omaha South and that Archie was under investigation and on administrative leave when he first applied to DCYC. In fact, Archie never made that concession. He was not under investigation for the relationship when he resigned. He was not on administrative leave when he applied to DCYC.

The dissent concluded that because "there is sufficient, relevant evidence in the record to support that Archie did not intentionally omit required information on his 2003 and 2004 applications,"[12] the Commission's decision should stand.

We granted Archie's petition for further review.

## III. ASSIGNMENTS OF ERROR

In his petition for further review, Archie asserts that the Court of Appeals erred by finding there was insufficient evidence for the Commission to conclude that Archie did not violate article 22, § 5(13) and (19), of the Manual.

## IV. STANDARD OF REVIEW

[1-3] In reviewing an administrative agency decision on a petition in error, both the district court and the appellate court review the decision to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency.[13] The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it.[14] The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact.[15]

---

[12] *Id.* at *13.

[13] *Fleming v. Civil Serv. Comm. of Douglas Cty.*, 280 Neb. 1014, 792 N.W.2d 871 (2011).

[14] *Id.*

[15] *Id.*

[4] An administrative agency decision must not be arbitrary and capricious.[16] Agency action is "arbitrary and capricious" if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion.[17]

[5-7] Appellate courts independently review questions of law decided by a lower court.[18] The interpretation of regulations presents questions of law.[19] Whether an agency decision conforms to the law is by definition a question of law.[20]

## V. ANALYSIS

### 1. REVIEW OF CIVIL SERVICE COMMISSION APPEALS BY PETITION IN ERROR

[8] The Commission is governed by Neb. Rev. Stat. §§ 23-2501 to 23-2516 (Reissue 2012). These statutes provide the Commission with various powers and responsibilities, including rulemaking and adjudicatory powers.[21] The Commission acts in a judicial manner when deciding employee appeals.[22]

When a county employee is terminated, suspended, or demoted, the department head must provide the employee with a written order explaining the reason for the discipline.[23] The employee then has the opportunity to appeal that decision to the Commission.[24] The Commission, acting in an

---

[16] See *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012).

[17] *Fleming v. Civil Serv. Comm. of Douglas Cty., supra* note 13.

[18] See *id.*

[19] See *id.*

[20] See *id.*

[21] §§ 23-2507 and 23-2511.

[22] See *Pierce v. Douglas Cty. Civil Serv. Comm.*, 275 Neb. 722, 748 N.W.2d 660 (2008).

[23] § 23-2510.

[24] *Id.*

adjudicatory fashion akin to a trial court, holds an appeal hearing "at which the employee shall be entitled to appear personally, be represented by counsel, cross-examine witnesses and produce evidence."[25] The Commission has the authority "to affirm, modify or revoke the order appealed from."[26] The Commission's decisions are final and binding on all parties.[27] A party adversely affected by a decision of the Commission is entitled to appeal to the district court through the petition in error statutes.[28]

[9] The purpose of a proceeding in error is to remove the record from an inferior to a superior tribunal so that the latter tribunal may determine if the judgment or final order of the inferior tribunal is in accordance with law.[29]

[10] An agency's decision must be supported by sufficient, relevant evidence.[30] The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did from the testimony and exhibits contained in the record before it.[31] The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact.[32]

In *Eshom v. Board of Ed. of Sch. Dist. No. 54*,[33] we explained that the "sufficient evidence" standard used to review an administrative body's decision in a proceeding in error is the

---

[25] § 23-2511.

[26] *Id.*

[27] *Id.*

[28] *Id.*; § 23-2515.

[29] *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985).

[30] *Fleming v. Civil Serv. Comm. of Douglas Cty., supra* note 13.

[31] *Id.*

[32] *Id.*

[33] See *Eshom v. Board of Ed. of Sch. Dist. No. 54, supra* note 29, 219 Neb. at 471, 364 N.W.2d at 11.

same standard as the "substantial evidence" and "competent evidence" standards used in administrative law. We explained that this inquiry is akin to the inquiry as to the sufficiency of the evidence to sustain a jury verdict: "[T]he evidence is 'substantial' or 'sufficient as a matter of law,' or constitutes 'some competent evidence,' if a judge could not, were the trial to a jury, direct a verdict."[34] The standard "is something less than the weight of the evidence and can be such as to permit the drawing of two inconsistent conclusions."[35]

Similarly, the U.S. Supreme Court has stated:

We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." . . . "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."[36]

Another authority has explained the substantial evidence standard of review:

The reviewing court's task on appeal is to determine if there is substantial evidence to support the agency's decision, not to determine if there is substantial evidence that contradicts the agency's decision. Accordingly, in determining whether an administrative decision is supported by substantial evidence, *the question for the appellate court is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made*. In other words, even if there is evidence in the record which tends to contradict an agency's factual determinations, so long as there is some substantial evidence in the record which supports the agency's determination, the court will affirm. . . . The mere possibility that the administrative record might support another

---

[34] *Id.*

[35] *Id.*

[36] *Consolo v. Federal Maritime Comm'n.*, 383 U.S. 607, 619-20, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) (citations omitted).

conclusion does not permit the reviewing court to make a finding inconsistent with the agency finding so long as there is substantial evidence to support it.[37]

[11-13] An agency's decision must not be arbitrary and capricious.[38] Agency action is arbitrary and capricious if it is taken in disregard of the facts or circumstances of the case, without some basis that would lead a reasonable and honest person to the same conclusion.[39] Agency action taken in disregard of the agency's own substantive rules is also arbitrary and capricious.[40] A review using the "arbitrary and capricious" standard requires considerable deference to the judgment and expertise of the agency.[41] A decision is arbitrary and capricious if the agency has relied on factors that the Legislature has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[42]

## 2. The Commission's
### Reinstatement of Archie

The record shows sufficient, relevant evidence for the Commission's decision to reinstate Archie and that this decision was not arbitrary and capricious.

The majority concluded that "in light of all the evidence, Archie's conduct violated [a]rticle 22, § 5(13) and (19)[,] of the . . . Manual, thereby constituting a basis for his termination."[43]

---

[37] 73A C.J.S. *Public Administrative Law and Procedure* § 531 at 383 (2014) (emphasis supplied).

[38] *Blakely v. Lancaster County, supra* note 16.

[39] *Id.*

[40] *Id.*

[41] *Central Platte NRD v. City of Fremont*, 250 Neb. 252, 549 N.W.2d 112 (1996) (White, C.J., concurring).

[42] *Id.*

[43] *Douglas County v. Archie, supra* note 1 at *5.

It found that the district court's decision affirming the Commission's reinstatement of Archie was arbitrary, capricious, and unsupported by sufficient, relevant evidence.

[14] Whether Archie's conduct violated the two relevant provisions of the Manual is not the relevant inquiry. The proper inquiry for an appellate court when reviewing the decision of an administrative agency on a petition in error is whether there was sufficient, relevant evidence to support the conclusion that the agency *did make* and not whether the evidence would support a contrary conclusion.[44]

[15] In the case at bar, there was conflicting evidence. But as the U.S. Supreme Court has explained, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."[45] As in reviewing a jury verdict, if there is sufficient evidence to support the decision, the reviewing court must affirm even if it "may be of the opinion that had it been the trier of the case, it would have reached a different conclusion."[46]

[16] The majority on the Court of Appeals panel concluded that "[t]he *district court's* decision affirming the Commission's reinstatement of Archie [was] arbitrary, capricious, and unsupported by sufficient, relevant evidence."[47] On a petition in error, the district court acts in an appellate capacity and employs the same deferential standard of review that an appellate court uses.[48] Thus, the question for the Court of Appeals was whether the district court erred in finding that the Commission's

---

[44] See, *Eshom v. Board of Ed. of Sch. Dist. No. 54, supra* note 29; 73A C.J.S., *supra* note 37.

[45] *Consolo v. Federal Maritime Comm'n., supra* note 36, 383 U.S. at 620.

[46] *Myers v. Platte Val. Pub. Power & Irr. Dist*., 159 Neb. 493, 507, 67 N.W.2d 739, 746 (1954). See, also, *Prescott v. Jones*, 13 Neb. 534, 14 N.W. 536 (1882).

[47] *Douglas County v. Archie, supra* note 1 at *5 (emphasis supplied).

[48] See *Fleming v. Civil Serv. Comm. of Douglas Cty., supra* note 13.

decision was supported by sufficient, relevant evidence and was not arbitrary and capricious.

The Commission issued a brief written order reversing Archie's termination, but it did not articulate the precise reasons behind its decision. Thus, in our review, we will consider whether there was sufficient evidence to conclude that Archie did not violate the two relevant provisions of the Manual.

#### (a) Subsection (19): Dishonest, Immoral, or Notoriously Disgraceful Conduct That Is Prejudicial to County

We conclude that there was sufficient, relevant evidence and that it was not arbitrary and capricious for the Commission to determine Archie did not violate article 22, § 5(19), by "engag[ing] in criminal, dishonest, immoral, or notoriously disgraceful conduct, which is prejudicial to the County or to [the] County's reputation."

To fall within the ambit of subsection (19), an employee's conduct must not only be "criminal, dishonest, immoral, or notoriously disgraceful," but must also be "prejudicial to the County or to [the] County's reputation." As an initial matter, no one suggests that Archie's conduct was criminal. Assuming, for the sake of argument, that Archie's conduct was "immoral" or "notoriously disgraceful," we conclude that the Commission could have reasonably determined that Archie's conduct was not prejudicial to the county or its reputation. Archie had been an exemplary employee with DCYC for 11 years.

It is not clear whether subsection (19) even applies to preemployment conduct. Subsection (19) can reasonably be understood to govern only the conduct of employees during their employment. The grounds for discipline listed in the Manual—with the exception of subsection (19) relating to information on an application or resume—"all relate to conduct *while employed by the County*."[49] The Manual states

---

[49] *Douglas County v. Archie, supra* note 1 at *14 (Bishop, Judge, dissenting) (emphasis supplied).

that "[t]he purpose of a disciplinary policy is to acquaint all employees with the rules that serve to guide their conduct in order that they can be contributing team members helping to achieve the objectives of better and more efficient service to the citizens of Douglas County." This stated purpose implies that the goal of the disciplinary provisions is to guide employee conduct *in the employees' positions as county employees*, and not to punish the employees for past bad behavior that occurred before they were hired by the county. To the extent that preemployment conduct is harmful to the county or its reputation, the county could have addressed this issue prior to employing Archie.

Conduct of an employee occurring during the course of employment is categorically distinct from conduct occurring prior to employment with regard to the prejudice to the county. While the county has no ability to prevent the prejudicial effect of a current employee's conduct prior to its occurrence, it does have the ability to inquire about past conduct prior to hiring an applicant.

Even assuming that article 22, § 5(19), of the Manual could apply to preemployment conduct, the Commission could have reasonably concluded that Douglas County was not prejudiced by Archie's conduct. Bryant's testimony before the Commission showed that DCYC had knowledge that Archie had resigned due to something involving a former student. It also was aware that Archie listed "spend time w/ kids" as his reason for leaving a teaching job in the middle of the school year. The Commission could have reasonably determined that the county did not suffer any prejudice when, knowing these facts, it apparently failed to conduct any further inquiry into his reason for leaving OPS and decided to "[g]ive him a shot." When, after over 11 years of exemplary service at DCYC, Archie's preemployment conduct was discovered, it was not unreasonable for the Commission to determine that the county was not unfairly prejudiced.

To the extent that the Commission's decision to reinstate Archie was premised upon the conclusion that Archie did

not violate subsection (19), that conclusion was supported by sufficient, relevant evidence and was not arbitrary and capricious.

### (b) Subsection (13): Intentional Omission of Required Information on Employment Application/Resume

We conclude that there was sufficient, relevant evidence and that it was not arbitrary and capricious for the Commission to determine Archie did not violate article 22, § 5(13), by engaging in "[f]alsification, fraud or intentional omission of required information on the employment application/resume."

The primary question was whether Archie engaged in an "intentional omission of required information" on his two DCYC applications. The evidence strongly supports the conclusion that Archie did not engage in "[f]alsification" or "fraud" because of his statement that he left OPS to spend more time with his family.

We give deference to the Commission's determination of what level of detail was "required" of Archie when explaining his reason for leaving a previous position. Given the fact that all information was a matter of public record, a generic reason such as "personal" was not considered an intentional omission. The reasons could then be explained to DCYC in a private interview.

The facts surrounding Archie's resignation were complex. The investigation into his relationship with the former student was part of the background of his resignation, but that investigation had ended before his resignation. The only ongoing investigation was whether he had lied about his whereabouts to OPS investigators. His desire to protect his children from rumors and negative attention was a part of his reason for leaving. It was not clear how much of this "whole situation" leading to Archie's resignation he was required to explain on the applications.

Alexander's testimony supports the fact that it was not considered an omission of required information to provide a

generic, but incomplete, reason for leaving a prior job, such as "personal," rather than providing a detailed explanation. He also stated that providing a reason such as "spend time w/ kids" or "Family" was the equivalent of writing "personal." Archie's reasons for leaving his job at OPS should have prompted further questions by DCYC in his interview. The record contains evidence that DCYC was aware he resigned due to "something with a former student" and that it decided to "[g]ive him a shot." The Commission could have reasonably concluded that Archie was not "required" to give a detailed answer as to his reason for leaving OPS and that his answers "spend time w/ kids" and "Family" were the same as stating the reasons were "personal."

Not only must the information omitted be required information to violate article 22, § 5(13), but the applicant must intentionally omit required information. Archie testified that he believed the reasons provided were accurate and honest. The Commission could have reasonably concluded that Archie did not believe he was omitting any required information on his applications, but that he instead believed he was giving all that was required. We will give deference to the Commission's determinations of credibility of the witnesses it observed.

To the extent that the Commission's decision to reinstate Archie was premised upon the conclusion that Archie did not violate subsection (13), that conclusion was supported by sufficient, relevant evidence and was not arbitrary and capricious.

### 3. Douglas County's Remaining
#### Assignments of Error

In its appeal to the Court of Appeals, Douglas County also asserted that the district court erred by upholding the Commission's refusal to make factual findings in its order as requested and by exceeding its statutory authority by considering information outside the record and not presented by either party (the material on the applicability of the PREA).

Douglas County did not seek review of the Court of Appeals' conclusion that it had failed to preserve its claim that the Commission erred by denying Douglas County's request to make specific findings of fact. Because this issue was not preserved, we do not address it further.

The Court of Appeals did not address Douglas County's remaining assignment of error—that the Commission erred by considering the material related to the applicability of the PREA. We conclude it is clear from the record that the material did not form the basis of the Commission's decision to reinstate Archie. Thus, Douglas County suffered no prejudice from the Commission's consideration of this material.

After hearing the evidence, the Commission delayed its decision "until [the] issue of whether . . . Archie would be able to be employed at [DCYC] pending a review of PREA and any other similar applicable rules and regulations." The fact that the Commission reinstated Archie, after its review, demonstrates that it concluded the PREA would not prohibit Archie's continued employment at DCYC. Therefore, the Commission's decision to reinstate Archie shows that it did not make its decision based on the PREA materials, but on the merits of the evidence presented by the parties.

Because the PREA materials were not part of the Commission's decision to reinstate Archie, Douglas County suffered no resulting prejudice.

## VI. CONCLUSION

Based upon our standard of review, we conclude that the Commission's decision was supported by sufficient, relevant evidence and was not arbitrary and capricious. We reverse the opinion of the Court of Appeals and remand the cause with directions to reinstate the judgment of the district court which affirmed the order of the Commission.

REVERSED AND REMANDED WITH DIRECTIONS.