Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/21/2017 08:11 AM CDT

- 501 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

COUNTY OF DOUGLAS, APPELLANT, V.
NEBRASKA TAX EQUALIZATION AND
REVIEW COMMISSION, APPELLEE.

___ N.W.2d ___

Filed April 27, 2017.    No. S-16-548.

1.  **Taxation: Appeal and Error.** Under Neb. Rev. Stat. § 77-5019(5) (Cum. Supp. 2016), appellate review of a decision by the Tax Equalization and Review Commission on a petition for review is conducted for error on the record of the commission.

2.  **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3.  **Administrative Law: Judgments: Evidence: Words and Phrases.** An agency decision is supported by competent evidence, sufficient evidence, or substantial evidence if the agency could reasonably have found the facts as it did on the basis of the testimony and exhibits contained in the record before it.

4.  **Administrative Law: Judgments: Words and Phrases.** Agency action is arbitrary, capricious, and unreasonable if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion. Agency action taken in disregard of the agency's own substantive rules is also arbitrary and capricious.

5.  **Appeal and Error.** When reviewing cases for error appearing on the record, an appellate court reviews questions of law de novo.

6.  **Pleadings: Judgments: Appeal and Error.** A trial court's decision to grant or deny a motion to reconsider is reviewed for an abuse of discretion.

7.  **Pleadings: Judgments: Motions to Vacate: Appeal and Error.** The abuse of discretion standard applies to an appellate court's review of a trial court's grant or denial of a motion to vacate or amend a judgment.

- 502 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

8. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

9. **Administrative Law: Judgments.** An administrative agency that is authorized to exercise quasi-judicial power is impliedly authorized to reconsider its own decisions.

Appeal from the Tax Equalization and Review Commission. Affirmed in part, and in part reversed.

Shakil A. Malik, Deputy Douglas County Attorney, for appellant.

Douglas J. Peterson, Attorney General, and L. Jay Bartel for appellee.

Heavican, C.J., Wright, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## I. NATURE OF CASE

The Tax Equalization and Review Commission (TERC) issued an order to Douglas County to show cause why TERC should not order the adjustment of the valuation of three subclasses of residential real property in Douglas County. After a show cause hearing at which Douglas County appeared, TERC ordered the proposed adjustments. Douglas County filed a motion to reconsider, which TERC overruled. Douglas County petitioned for review with the Nebraska Court of Appeals. It subsequently filed a petition to bypass, which we granted. We affirm in part, and in part reverse.

## II. BACKGROUND

In April 2016, TERC held its statewide equalization hearing. The State of Nebraska's Property Tax Administrator (PTA) (the head of the property assessment division of the Nebraska Department of Revenue[1]) submitted reports for each

---

[1] Neb. Rev. Stat. § 77-701(1) (Cum. Supp. 2016).

- 503 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

county to TERC. As required by Neb. Rev. Stat. § 77-5027 (Cum. Supp. 2016), the reports analyzed the level and quality of assessment of the classes and subclasses of real property within each Nebraska county and made nonbinding equalization recommendations.

The report for Douglas County analyzed residential real property by dividing it into six valuation area subclasses (areas) based on geography and other common features of each area. The report analyzed the assessment-to-sales ratios within these areas. The assessment-to-sales ratio is the ratio of assessed value to sales price, calculated for every property sold in an arm's-length transaction. These ratios are based on the sales in the state "sales file."[2] The assessment of each class and subclass of most kinds of real property is required by statute to fall within 92 to 100 percent of actual value, as measured by an indicator of "central tendency," such as the median, mean (average), or weighted mean ratio.[3]

Three of the areas in Douglas County had median assessment-to-sales ratios outside the statutory range: "Area 2" had a median of 104.82 percent, "Area 3" had a median of 89.77 percent, and "Area 4" had a median of 90.08 percent. The overall median ratio for residential real property in Douglas County was 92 percent.

The report recommended increasing the valuation of Areas 3 and 4 by 7 percent. It reached this conclusion on the basis of a variety of statistics that showed that the true level of value for both areas was 90 percent of market value, which is below the statutory range.

The report also recommended that no change be made for Area 2 because "[t]he quality statistics . . . suggest [that] values are not uniform and widely vary from the median ratio." The statistics in the PTA's report indicated that there was a high level of dispersion and lack of uniformity in the ratios in

---

[2] Neb. Rev. Stat. § 77-1327(3) (Cum. Supp. 2016).

[3] Neb. Rev. Stat. § 77-5023 (Reissue 2009).

- 504 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

Area 2. There was a lack of uniformity between higher- and lower-value properties in the area. The higher-value properties were underassessed, and the lower-value properties were overassessed.

The report indicated that the statistics for Area 2, such as the median, were skewed by a significant number of low-value sales. The median for Area 2 was 104.82 percent. But excluding sales of properties under $15,000, the median ratio of Area 2 was 100.45 percent; excluding sales under $30,000, the median ratio was 96.21 percent. The report concluded, "Considering the ratio study statistics for the strata of sales above $30,000[,] the valuations [of Area 2] are considered acceptable."

TERC issued an order to show cause why it should not increase the valuation of Areas 3 and 4 by 7 percent and decrease that of Area 2 by 8 percent. At the show cause hearing, Chief Field Deputy Jack Baines of the Douglas County assessor's office testified that there was a low-average sales price in Area 2, which, when combined with a small number of higher-price sales, tended to skew the data and skew the median ratio. He explained that with lower value properties, smaller differences between the assessed value and sales price would cause a greater difference in the assessment-to-sales ratio.

As to Areas 3 and 4, Baines believed that the data underlying the statistics in the PTA's report was unreliable and that no changes should be made. Baines was new to his position. He testified that some of the assessment practices and procedures that he observed upon his arrival, such as not validating sales for the state sales file to make sure they qualified as arm's-length transactions, rendered the sales file data unreliable. Because he believed the sales file data was unreliable, he concluded that the statistics calculated from that data were unreliable. He argued that under generally accepted mass appraisal techniques, no changes should be made, because the data was unreliable. Baines stated that the correct course would be to correct the appraisal model and reappraise properties going

- 505 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

forward without making any blanket equalization adjustment. Baines' testimony and the details of the PTA's report are discussed in more detail in our analysis.

The PTA was asked whether any of Baines' testimony affected her recommendations. She stood by her recommendations as contained within the report to increase the valuation of Areas 3 and 4 by 7 percent and that no change be made for Area 2. TERC voted to increase the valuation of Areas 3 and 4 by 7 percent and decrease that of Area 2 by 8 percent.

Prior to the issuance of TERC's written order, Douglas County filed a motion to reconsider and offered as additional evidence an affidavit from Baines. The motion and affidavit explained that Douglas County had compared the sales data submitted to the state by the county in its annual "Assessed Value Update" (AVU). The county discovered that many of the sales that it categorized as nonusable non-arm's-length transactions in the AVU were included in the data for the PTA's report. But the state had not given the county notice that it disagreed with the county's categorization of those sales, as required in regulation. The motion requested that TERC grant a hearing and reconsider and vacate its prior order.

The TERC commissioners voted 2 to 1 to deny the motion to reconsider and on the same day issued a written order adjusting the valuation as it had voted to do at the hearing. Douglas County appeals TERC's order and the denial of its motion to reconsider. We granted Douglas County's petition to bypass the Court of Appeals and moved this case to our docket.

### III. ASSIGNMENTS OF ERROR

Douglas County claims that TERC's decision to decrease the valuation of Area 2 and increase the valuation of Areas 3 and 4 failed to conform with the law, was unsupported by competent evidence, and was arbitrary, capricious, and unreasonable. It also claims that TERC's denial of its motion to reconsider was arbitrary, capricious, and unreasonable and constituted an abuse of discretion.

## IV. STANDARD OF REVIEW

[1-5] Under Neb. Rev. Stat. § 77-5019(5) (Cum. Supp. 2016), appellate review of a decision by TERC on a petition for review is conducted for "error on the record of [TERC]." When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[4] An agency decision is supported by "'competent evidence,'" "'sufficient evidence,'" or "'substantial evidence'" if the agency could reasonably have found the facts as it did on the basis of the testimony and exhibits contained in the record before it.[5] Agency action is arbitrary, capricious, and unreasonable if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion.[6] Agency action taken in disregard of the agency's own substantive rules is also arbitrary and capricious.[7] When reviewing cases for error appearing on the record, an appellate court reviews questions of law de novo.[8]

## V. ANALYSIS

### 1. P<span>RINCIPLES AND</span> E<span>XPLANATION OF</span> E<span>QUALIZATION</span>, M<span>ASS</span> A<span>PPRAISAL</span>, <span>AND</span> S<span>TATE</span> S<span>ALES</span> F<span>ILE</span>

Before reviewing TERC's order decreasing the valuation of Area 2 and increasing the valuation of Areas 3 and 4 and its denial of Douglas County's motion to reconsider, it is necessary to review the background principles and the legal framework of equalization, mass appraisal, and the state sales file.

---

[4] *County of Douglas v. Nebraska Tax Equal. & Rev. Comm.*, 262 Neb. 578, 635 N.W.2d 413 (2001).

[5] *Douglas County v. Archie*, 295 Neb. 674, 689-90, 891 N.W.2d 93, 104-05 (2017).

[6] *Douglas County v. Archie, supra* note 5.

[7] *Id.*

[8] See *id.*

- 507 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

### (a) Equalization and Mass Appraisal

The Nebraska Constitution mandates that "[t]axes shall be levied by valuation uniformly and proportionately upon all real property . . . ."[9] To effectuate this mandate, the Constitution establishes TERC, granting it the "power to review and equalize assessments of property for taxation within the state."[10]

TERC is required by statute to "annually equalize the assessed value . . . of all real property as submitted by the county assessors on the abstracts of assessments."[11] In the exercise of this duty, TERC is granted "the power to increase or decrease the value of a class or subclass of real property in any county . . . so that all classes or subclasses of real property in all counties fall within an acceptable range."[12]

To assist TERC in its equalization responsibilities, the PTA is mandated by statute to prepare "reports and opinions" for each county; these reports must "contain statistical and narrative reports informing [TERC] of the level of value and the quality of assessment of the classes and subclasses of real property within the county" and may include nonbinding equalization recommendations.[13]

TERC may equalize classes and subclasses of real property to ensure that they are within an "acceptable range"; an acceptable range of property valuation is defined in statute as "the percentage of variation from a standard for valuation as measured by an established indicator of central tendency of assessment."[14] For residential property, the acceptable range of assessed valuation is 92 to 100 percent of actual value. Whether a class or subclass of property falls within an

---

[9] Neb. Const. art. VIII, § 1.

[10] Neb. Const. art. IV, § 28.

[11] Neb. Rev. Stat. § 77-5022 (Cum. Supp. 2016).

[12] § 77-5023(1).

[13] § 77-5027(3).

[14] § 77-5023(2).

- 508 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

"acceptable range" is to be determined by TERC "to a reasonable degree of certainty relying upon generally accepted mass appraisal techniques."[15] Generally accepted mass appraisal techniques include the standards promulgated by the International Association of Assessing Officers (IAAO).[16]

Whether a class or subclass of real property is within an acceptable range is measured by an "Established Indicator of Central Tendency."[17] An indicator of central tendency is "[t]he result of measuring the tendency of most kinds of data to cluster around some typical or central value . . . includ[ing] the mean, median, and mode."[18] An *established* indicator of central tendency of assessment is one that is "utilized in generally accepted professional mass appraisal techniques."[19] Under both TERC's regulations and the IAAO standards, the preferred indicator of central tendency is the median.[20] Thus, TERC prefers that valuation data "'cluster'" around the median.[21]

When studying whether a class or subclass of real property is within the acceptable range of assessed to actual value, actual value (i.e., market value) is often determined by looking to sales data. A "[s]ales ratio study" is one that uses sales data as a proxy for determining market value.[22] The PTA's reports use sales ratio studies to determine the value of residential property.[23]

---

[15] § 77-5023(5).

[16] 442 Neb. Admin. Code, ch. 2, § 001.45 (2011).

[17] *Id*., ch. 9, § 002.08 (2011).

[18] *Id*., § 002.10.

[19] *Id.*, § 002.08.

[20] *Id.*, § 004 (2011); International Association of Assessing Officers, Standard on Ratio Studies (2013).

[21] *County of Franklin v. Tax Equal. & Rev. Comm., ante* p. 193, 195, ___ N.W.2d ___, ___ (2017). Accord 442 Neb. Admin. Code, ch. 9, §§ 002.10 and 004; Standard on Ratio Studies, *supra* note 20.

[22] 442 Neb. Admin. Code, ch. 9, § 002.19 (2011).

[23] § 77-1327(3).

- 509 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

A primary tool for measuring the ratio of assessment to actual value is the assessment-to-sales ratio.[24] This ratio is calculated by dividing a parcel of property's assessed value by the sales price of that parcel of property. For example, a house with an assessed value of $95,000 that sells for $100,000 would have an assessment-to-sales ratio of 95 percent. Conversely, a house with an assessed value of $100,000 that sells for $95,000 would have an assessment-to-sales ratio of 105.26 percent. Thus, using this ratio and using the median as the indicator of central tendency for a class or subclass of property, the median assessment-to-sales ratio would need to fall between 92 and 100 percent to be within the acceptable range.

The usefulness and accuracy of measures of "central tendency" such as median and mean depend on the "quality" or "reliability" of the assessments.[25] Various tools are also used under professionally accepted mass appraisal methods to review the reliability of the measurements of central tendency.[26] The IAAO Standard on Ratio Studies[27] explains the importance of quality statistics:

> The calculated measures of central tendency are point estimates and provide only an indication, not proof, of whether the level meets the appropriate goal. Confidence intervals and statistical tests should be used to determine whether the appraisal level differs from the established goal in a particular instance.
>
> A decision by an oversight agency to take some action (direct equalization, indirect equalization, reappraisal) can have profound consequences for taxpayers, taxing jurisdictions, and other affected parties. This decision should not be made without a high degree of certainty that the action is warranted.

---

[24] 442 Neb. Admin. Code, ch. 9, § 002.02 (2011).

[25] See Standard on Ratio Studies, *supra* note 20 at 33-34.

[26] 442 Neb. Admin. Code, ch. 9, § 002.17 (2011).

[27] Standard on Ratio Studies, *supra* note 20 at 33.

- 510 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

The "Coefficient of Dispersion" (COD) is used to measure the uniformity of assessments.[28] The COD is the average difference between each assessment-to-sales ratio and the median assessment-to-sales ratio. To illustrate: Imagine a dataset with three ratios, 50, 100, and 110 percent. The median ratio would be 100 percent. The respective absolute differences between the ratios and the median ratio (100 percent) would be 50, 0, and 10 percent. These ratios would average to produce a COD of 20 percent. A lower COD indicates a higher level of uniformity of assessment-to-sales ratios, while a higher COD indicates less uniformity. Under TERC regulations and the IAAO standards, the acceptable range of COD for residential property is 15 percent or less[29]; that is, the ratios must be, on average, within 15 percent of the median ratio.

The "Price Related Differential" (PRD) is a measure used "to determine whether properties of differing values are treated uniformly."[30] PRD is calculated by dividing the mean ratio by the weighted mean ratio.[31] Too high or low of a PRD indicates "vertical inequity," either regressivity (underassessed high-value properties and overassessed low-value properties) or progressivity (overassessed high-value properties and underassessed low-value properties). A PRD of under 1 indicates progressivity, while a PRD of over 1 indicates regressivity.[32]

Vertical inequities of the regressive or progressive variety are to be avoided.[33] Under TERC regulations and the IAAO

---

[28] 442 Neb. Admin. Code, ch. 9, § 002.04 (2011).

[29] *Id.*, § 005.02 (2011); Standard on Ratio Studies, *supra* note 20 (5 to 15 percent).

[30] 442 Neb. Admin. Code, ch. 9, § 002.15 (2011).

[31] Standard on Ratio Studies, *supra* note 20 (explaining that weighted mean is calculated by dividing total assessed value of all selling properties by total sales value of all selling properties, resulting in ratio that is weighted for relative value of properties). See, also, 350 Neb. Admin. Code, ch. 17, § 002.19 (2013).

[32] *Id.*

[33] Standard on Ratio Studies, *supra* note 20.

standards, the acceptable range for PRD is 0.98 to 1.03 (98 to 103 percent).[34] Under the IAAO standards, "[u]nacceptable vertical inequities should be addressed through reappraisal or other corrective actions,"[35] rather than through blanket equalization changes.

The "confidence interval" measures the precision of the sampling process, while the "confidence level" is the "degree of probability associated with a statistical test or confidence interval."[36] The confidence interval measures how reliably the sold properties represent all of the other properties in the class or subclass.[37] Generally, a larger sample size and greater uniformity of ratios result in a narrower confidence interval.[38] A narrower range of confidence interval indicates a greater reliability of a statistical measure (e.g., the median).[39] For example, Area 3 had a 95-percent median confidence interval of 89.43 to 90.28 percent, meaning that the true median is 95-percent likely to fall within that range. Under the IAAO standards, if any part of the confidence interval overlaps with the acceptable range, equalization is not appropriate.[40] The PTA's reports are required by regulation to include a 95-percent confidence interval for each of the measures of central tendency.[41]

### (b) Sales File

The "sales file" is "a data base of sales of real property, including arm's length transactions, in the State of

---

[34] 442 Neb. Admin. Code, ch. 9, § 005.03 (2011); Standard on Ratio Studies, *supra* note 20.

[35] Standard on Ratio Studies, *supra* note 20 at 15.

[36] 442 Neb. Admin. Code, ch. 9, §§ 002.06 and 002.07 (2011).

[37] Standard on Ratio Studies, *supra* note 20.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] 350 Neb. Admin. Code, ch. 17, § 004.01C(2)(k) (2013).

- 512 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

Nebraska" and is developed and maintained by the state PTA.[42] All sales in the sales file are deemed to be "arm's length" transactions unless determined otherwise.[43] The sales file data is used by the PTA as the basis for her annual assessment ratio reports.[44]

Nearly every real estate transaction in Nebraska requires the filing of a real estate transfer statement with a county register of deeds.[45] These statements require certain information about the transaction and conveyance, such as the amount of consideration paid.[46] The statements must be sent by the register of deeds to the county assessor.[47]

The county assessors must provide supplemental information for each sale in the form of a sales worksheet.[48] The sales worksheet must indicate whether the sale is qualified as an arm's-length transaction for the sales file, providing an explanation for any sales deemed to be non-arm's-length transactions.[49] The transfer statements and the sales worksheets are sent from the county assessors to the Department of Revenue on a monthly basis.[50]

The assessor's opinion as to whether a sale qualifies as an arm's-length transaction is presumed to be correct.[51] The Department of Revenue's property assessment division may

---

[42] *Id.*, ch. 12, § 001.01 (2009).

[43] § 77-1327(2).

[44] § 77-1327(3).

[45] Neb. Rev. Stat. § 76-214 (Cum. Supp. 2014). See, also, § 77-1327(2); 350 Neb. Admin. Code, ch. 12, § 003.01 (2009).

[46] §§ 76-214 and 77-1327.

[47] § 76-214(1).

[48] 350 Neb. Admin. Code, ch. 12, §§ 003.03 and 003.03A (2009). See, also, § 76-214(1).

[49] 350 Neb. Admin. Code, ch. 12, § 003.03C (2009).

[50] § 76-214(1); 350 Neb. Admin. Code, ch. 12, §§ 003.01, 003.03, and 003.03A.

[51] 350 Neb. Admin. Code, ch. 12, § 003.04 (2009).

- 513 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

override a county assessor's determination of whether a sale qualifies as an arm's-length transaction, but must give notice to the assessor of its decision in writing within 7 days.[52] And it may not overturn a county commissioner's determination that a sale qualifies or does not qualify as an arm's length transaction unless it reviews the sale and determines that the assessor is incorrect.[53] The process of disputing sales categorizations between county assessors and the Department of Revenue's property assessment division is set forth in detail in regulation.[54]

On an annual basis, county assessors must provide the Department of Revenue and the PTA an "abstract of the property assessment rolls."[55] According to the regulations, the "County Abstract of Assessment Report" for real property consists of, among other things, the AVU, characterized as "the Report of [the] Current Year's Assessed Value for Properties Listed in the State's Sales File."[56] Generating the AVU, according to the state "Sales File Practice Manual," is "the process of populating current assessed values for the sales already located in the state sales file" for use in the assessment-to-sales ratio for the PTA's report. That is, the AVU provides the state with the assessment information to match the sales information the state already has in its sales file through the real estate transfer statements and sales worksheets.

The sales file is used as the basis for the PTA's comprehensive sales assessment ratio studies.[57] The PTA's sales assessment ratio studies are used in their annual reports and opinions for each county to aid TERC in its equalization duties.[58]

---

[52] *Id.*, § 003.04D (2009).

[53] *Id.*

[54] *Id.*, §§ 003.04 to 003.04E (2009).

[55] Neb. Rev. Stat. § 77-1514 (Cum. Supp. 2016).

[56] 350 Neb. Admin. Code, ch. 60, § 002.02A (2009).

[57] § 77-1327(3). See, also, § 77-5027.

[58] § 77-5027.

- 514 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

The reports for each county "contain statistical and narrative reports informing [TERC] of the level of value and the quality of assessment of the classes and subclasses of real property."[59]

## 2. TERC's Equalization Orders

### (a) Area 2

TERC ordered an 8-percent decrease to the valuation of Area 2. Both the PTA's report and Baines in his testimony at the show cause hearing explained that the lower-value sales were skewing the data and that no change should be ordered for Area 2. TERC nevertheless ordered the decrease. Douglas County argues that this decision was unsupported by competent evidence; was arbitrary, capricious, and unreasonable; and failed to conform to law. We agree.

The PTA's report showed that the median assessment-to-sales ratio for Area 2 was 104.82 percent. But whether a class or subclass of property falls within the acceptable range is to be "determined to a reasonable degree of certainty [by] relying upon generally accepted mass appraisal techniques,"[60] which include the standards of the IAAO.[61] As the IAAO standards explain, measures of central tendency, such as the median, "are point estimates and provide only an indication, not proof, of whether the level meets the appropriate goal."[62] Other statistics and factors must be considered to determine to a reasonable degree of certainty whether the median is a reliable indicator of central tendency.

One of these factors is the COD, which measures the uniformity or dispersion of assessments.[63] The acceptable range

---

[59] *Id.*

[60] § 77-5023(5).

[61] 442 Neb. Admin. Code, ch. 2, § 001.45.

[62] Standard on Ratio Studies, *supra* note 20 at 33.

[63] 442 Neb. Admin. Code, ch. 9, § 002.04; Standard on Ratio Studies, *supra* note 20.

of COD under TERC's regulations and the IAAO standards for residential real property is under 15 percent.[64] The COD for Area 2 was 48.43 percent. This means that the average assessment-to-sales ratio of the sold properties is 48 percent above or below the median of 104 percent. While the median is at 104 percent, most properties in Area 2 are significantly above or significantly below this median. TERC's 8-percent adjustment would not solve Area 2's lack of assessment uniformity, but would only shift the problem. The proper method for solving such problems of dispersion is "model recalibration and/or reappraisal,"[65] not blanket equalization orders.

The "acceptable range" of valuation must be determined by an established "indicator of central tendency,"[66] which is defined as "[t]he result of measuring the tendency of most kinds of data to cluster around some typical or central value."[67] If the assessment-to-sales ratios in a class or subclass of property suffer from such a lack of uniformity that the ratios do not "cluster around some typical or central value," then there is no "central tendency" to measure.[68] With a COD in Area 2 of 48.43 percent, the data unquestionably does not cluster around the median. Reappraisal, not equalization, is the proper remedy for such a lack of uniformity.[69]

Not only does Area 2 suffer from a lack of overall uniformity of assessments, but there is a lack of uniformity between higher-value and lower-value properties, referred to as "regressive vertical inequity." The PRD measures the uniformity of assessment between higher- and lower-value properties. The acceptable range of PRD under TERC's regulations

---

[64] 442 Neb. Admin. Code, ch. 9, § 005.02; Standard on Ratio Studies, *supra* note 20.

[65] Standard on Ratio Studies, *supra* note 20 at 18.

[66] § 77-5023.

[67] 442 Neb. Admin. Code, ch. 9, § 002.10.

[68] See, generally, *id.*

[69] See Standard on Ratio Studies, *supra* note 20.

and the IAAO standards for residential real property is 0.98 to 1.03 (98 to 103 percent). The PRD for Area 2 is 1.22 (122 percent). What this statistic shows is that lower-value properties in Area 2 are significantly overassessed while higher-value properties are significantly underassessed. But like overall uniformity problems, vertical inequities are not solved by equalization orders, but, rather, "should be addressed through reappraisal or other corrective actions."[70]

The COD and the PRD show that there are significant problems with the assessments in Area 2, but not problems that would be solved through the 8-percent decrease TERC ordered. Prior to the decrease, the median ratio for all sales of $15,000 and over was 100.45 percent (which would round to 100 percent and be within the acceptable range) and the median ratio for all sales of $30,000 and over was 96.21 percent (right in the middle of the acceptable range). The decrease would leave the median ratio for all sales of $15,000 and over at 92.41 percent (at the bottom of the acceptable range) and the median ratio for all sales of $30,000 and over at 88.51 percent (well below the acceptable range). The decrease would only reduce the median for sales under $30,000 from 149 to 137 percent. Sales of $15,000 and over represent 554 of the 632 sales (87 percent) in the study for Area 2, while sales of $30,000 and over represent 393 of 632 sales (62 percent).

This data shows not only that the lower-price sales, as Baines and the PTA explained, were skewing the data, but also that an across-the-board equalization order would not solve the valuation problems in Area 2. The decrease would leave a large percentage of mid- to higher-value properties under the acceptable range, while making only a small dent in the level of overassessment of lower-value properties. It would leave the median ratio of all properties sold for *over* $30,000—representing 62 percent of all the properties sold—below the statutory range at 88.51 percent; the median ratio for properties sold for

---

[70] *Id.* at 29.

- 517 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

*under* $30,000 would still be well over the statutory range at 137 percent. The problems in Area 2 with a lack of uniformity and regressive vertical inequity would not be solved by the decrease ordered by TERC. As the IAAO standards explain:

> States . . . that employ direct equalization techniques should understand that such *equalization is not a sub-stitute for appraisal or reappraisal*. . . . [E]qualization cannot improve uniformity between properties within a given [class or subclass of property]. For this reason, reappraisal orders should be considered as the primary corrective tool for uniformity problems . . . .[71]

Before voting to decrease the valuation of Area 2, and in the course of questioning Baines, Commissioner Robert Hotz discussed his concern about how lower-value properties in the area were significantly overassessed, while mid- to higher-value properties were correctly or underassessed. He explained his reasoning for voting for the decrease:

> I don't think [TERC] has the authority to [adjust only lower-value properties]. And so, to some degree, we look at this — and we've read the correlation section and we hear the [PTA's] recommendation that we not do an adjustment on this. I'm hearing you say the same thing. And I'm looking at statistics that tell me these low-dollar properties are over-assessed. *It's got to be fixed.* And I don't think I have the authority to do it unless I take the higher-dollar properties, *they get to kind of ride on the coattails of that adjustment, and then be under-assessed* —
>
>     . . . .
>     . . . I don't want that result either. Right now, the low-dollar properties are carrying the freight and they shouldn't be. Now, it's really hard to assess low-dollar properties for the reasons that you've explained. I kind of understand that.

---

[71] Standard on Ratio Studies, *supra* note 20 at 21-22 (emphasis supplied).

- 518 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

(Emphasis supplied.) Hotz went on to say to Baines, "It's a little frustrating to see what appears to be a significant area of your county where it appears to be over-assessed." He explained that he thought ordering the decrease would be "the lesser of two evils" because there were more lower-value properties than higher-value properties in the area, even though it would put the higher-value properties out of the acceptable range.

Hotz' and TERC's desire to remedy the problems in Area 2 is understandable. But across-the-board equalization orders are not a cure-all for every valuation ailment. The proper remedy for the lack of uniformity is reappraisal. Equalization is a blunt tool and cannot cure uniformity problems. TERC need not choose "the lesser of two evils"; its equalization tool is capable of solving only one "evil": assessment levels that are out of range as determined to a reasonable degree of certainty by a reliable indicator of central tendency. Fixing the uniformity problems is a task belonging to Douglas County. Baines testified that he was working on resolving the problems in Area 2 (and across Douglas County) by doing things such as developing an entirely new valuation model that would bring the median ratio in Area 2 down to 97 percent and redrawing the borders between valuation areas to more accurately reflect market areas. These narrowly tailored approaches are a more proper approach for resolving the valuation uniformity problems in Area 2.

Given the fact that neither the PTA nor Douglas County presented evidence that would support TERC's decision to decrease the valuations of Area 2, we cannot conclude that TERC's decision was supported by competent evidence. As such, its order decreasing the valuation of Area 2 by 8 percent was therefore arbitrary, capricious, and unreasonable.

### (b) Areas 3 and 4

TERC ordered a 7-percent increase to the valuation of Areas 3 and 4. Douglas County argues that this order was

- 519 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

unsupported by competent evidence; was arbitrary, capricious, and unreasonable; and failed to conform to law. We disagree.

The PTA's report shows that the median assessment-to-sales ratios for Areas 3 and 4 were 89.77 and 90.08 percent, respectively, falling outside the statutory range of 92 to 100 percent. But unlike in Area 2, the quality statistics show that the median is a reliable indicator of central tendency.

The COD for Areas 3 and 4 was 15.27 and 12.49 percent. These are within or at the top of the acceptable range for the COD, which shows that Areas 3 and 4 are reasonably uniform. The PRD for Areas 3 and 4 was 1.0571 (105.71 percent) and 1.0347 (103.47 percent), at or slightly above the top of the acceptable range of 0.98 to 1.03. While this shows some minor regressive vertical inequity, it is minimal—standing in stark contrast to the 1.22 (122 percent) PRD in Area 2.

Moreover, the median confidence interval for Areas 3 and 4 shows that the median ratios for these areas are accurate indicators of central tendency. The median 95-percent confidence interval for Area 3 is 89.43 to 90.28 percent. The median 95-percent confidence interval for Area 4 is 89.73 to 90.5 percent. Both of these ranges are entirely outside the acceptable range of 92 to 100 percent. Moreover, these ranges are very narrow, less than 1 percent, indicating a high degree of sample reliability. That is, the median assessment-to-sales ratio is likely to be a very reliable indicator of the ratio of assessed to actual value of other properties in those areas.

There is very little in the PTA's data that would show that the median ratios of Areas 3 and 4, which are below the acceptable range, are not accurate and reliable indicators of central tendency. Instead, Douglas County relies heavily on the testimony of Baines before TERC in the show cause hearing that alleged that the sales data itself was unreliable.

Baines had been in the position of chief field deputy in the Douglas County register of deeds and assessor's office since April 2015. Prior to taking that position, he worked as an appraiser for 28 years in Kansas, including in the Kansas

- 520 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

City area. When he began working as chief field deputy, Baines noticed problems with the existing appraisal practices in Douglas County. He stated that he "immediately started uncovering inconsistencies." He realized that his staff was mostly not verifying sales to determine if they were qualified arm's-length transactions usable in the PTA's sales ratio study. Baines noticed that his predecessor had not completed any "scope of work" documents outlining how the assessments had been done each year. Vacant lots were "grossly undervalued" in some areas and "grossly overvalued" in others. Baines worked with the Department of Revenue's property assessment division to implement sales verification training for his staff. He also sent out surveys to attempt to verify 2013 and 2014 sales that were significantly out of range.

Baines said that after implementing changes in Douglas County's assessing practices, he was surprised when he received the 2016 data from the state; many of the statistics had changed significantly. He said, "[T]here has to be something drastically changing there to make that happen" and suspected that the change in the statistics after he arrived may have been the result of prior "sales chasing," which is the improper practice of "using the sale of a property to trigger a reappraisal of that property at or near the selling price."[72] Sales chasing makes a sales ratio study unreliable because the assessed values of sold properties are no longer representative of the assessed values of all the other properties in the study area.[73] Baines explained that if sales chasing had occurred, that meant that "the data that was submitted to [the Department of Revenue's property assessment division] was manipulated to the point where it was in range [which] told me I couldn't rely on those sales to value other properties."

Baines' primary reason why he believed no changes should be made by TERC to the valuation of Areas 3 and 4 was

[72] *Id*. at 43.

[73] See Standard on Ratio Studies, *supra* note 20.

- 521 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

that the sales data underlying the PTA's statistics was unreliable. Because the underlying data was unreliable, Baines said, according to generally accepted standards of mass appraisal, no changes should be made.

While Baines' testimony raises some questions about the reliability of the data due to the practices of the Douglas County assessor's office prior to his arrival, we do not find that TERC's decision to order a 7-percent increase to the valuation of Areas 3 and 4 was unsupported by competent evidence or was arbitrary, capricious, and unreasonable. Baines testified about problems he observed in Douglas County's assessment practices, such as not verifying sales. But his testimony that there may have been sales chasing was simply offered as a possible explanation for the surprising changes he observed in the data from 2015 to 2016. While this explanation could be correct, TERC was not unreasonable in failing to credit this explanation and nonetheless relying on the statistics based on the sales file data. Providing a few examples of improper procedures or practices does not establish beyond dispute that the sales file was unreliable. Our standard of review is a deferential one. It is not our task to determine de novo whether the sales file data was so unreliable that no changes should be made, but, rather, our task is to determine whether TERC acted unreasonably in reaching its conclusion. We believe that TERC did not act unreasonably here. Its decision was supported by the evidence provided by the PTA. TERC's decision to order a 7-percent increase in valuation for Areas 3 and 4 was supported by competent evidence and was not arbitrary, capricious, and unreasonable.

### 3. MOTION TO RECONSIDER

After TERC voted to order the valuation adjustments to Areas 2 through 4, but before it issued its written order, Douglas County submitted a motion to reconsider, requesting a hearing and that TERC thereafter reconsider and vacate its prior order. Included with the motion was an affidavit by

- 522 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

Baines alleging that the PTA improperly included sales in her report that Douglas County has designated as non-arm's-length transactions, without notifying the county as required by regulation. TERC voted 2-to-1 to deny the motion to reconsider. Douglas County argues that this was an abuse of discretion. We disagree.

### (a) Standard of Review

[6,7] We have yet to address the applicable standard of review for a motion to reconsider in the administrative law context. A trial court's decision to grant or deny a motion to reconsider is reviewed for an abuse of discretion.[74] Similarly, the abuse of discretion standard applies to our review of a trial court's grant or denial of a motion to vacate or amend a judgment.[75]

[8] We conclude that the abuse of discretion standard should also apply to our review of the grant or denial of a motion to reconsider by an administrative body. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[76]

### (b) Procedure

First, TERC argues, citing cases from other jurisdictions,[77] that it is improper to use a motion to reconsider to raise evidence that could have been raised in the earlier proceeding. It also cites Nebraska case law in which we have held that granting a motion for new trial on the basis of newly discovered

---

[74] *State v. Bao*, 269 Neb. 127, 690 N.W.2d 618 (2005); *Frerichs v. Nebraska Harvestore Sys.*, 226 Neb. 220, 410 N.W.2d 487 (1987); *Gutchewsky v. Ready Mixed Concrete Co.*, 219 Neb. 803, 366 N.W.2d 751 (1985). See *Ryder v. Ryder*, 290 Neb. 648, 861 N.W.2d 449 (2015).

[75] See *Ryder v. Ryder, supra* note 74.

[76] *State v. Cerritos-Valdez*, 295 Neb. 563, 889 N.W.2d 605 (2017).

[77] *J.P. v. Smith*, 444 N.J. Super. 507, 134 A.3d 977 (2016); *Cho v. State*, 115 Haw. 373, 168 P.3d 17 (2007).

- 523 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

evidence is not proper when the evidence could have been discovered before trial with diligent inquiry.[78]

But we have not previously considered whether new evidence, or evidence available at the time of the prior proceeding, may be now presented as the basis for a motion to reconsider. In both the civil and the criminal context, the grounds upon which *a motion for new trial* may be granted are limited by statute and include newly discovered evidence.[79] But there is no statute or court rule that limits a motion for reconsideration to newly discovered evidence. And in other contexts, we have distinguished a motion for reconsideration from a motion for new trial.[80]

[9] We have held that an administrative agency that is authorized to exercise quasi-judicial power is impliedly authorized to reconsider its own decisions.[81] TERC's regulations allow it to reconsider any order it has issued during its statewide equalization proceedings.[82]

We have explained that a motion for reconsideration is nothing more than an invitation to the court to consider exercising its inherent power to vacate or modify its own judgment.[83] In some contexts, a motion for reconsideration may also be treated as a motion to alter or amend a judgment for purposes of terminating the appeal period under Neb. Rev. Stat. § 25-1329 (Reissue 2016).[84]

As to a motion to reconsider, it appears to be an open question whether an administrative agency or commission acting

---

[78] See *Maddox v. First Westroads Bank*, 199 Neb. 81, 256 N.W.2d 647 (1977).

[79] See Neb. Rev. Stat. §§ 25-1142 and 29-2101 (Reissue 2016).

[80] *Kinsey v. Colfer, Lyons*, 258 Neb. 832, 606 N.W.2d 78 (2000).

[81] *City of Lincoln v. Twin Platte NRD*, 250 Neb. 452, 551 N.W.2d 6 (1996); *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994).

[82] 442 Neb. Admin. Code, ch. 9, § 009.07 (2011).

[83] *Kinsey v. Colfer, Lyons, supra* note 80.

[84] *State v. Bellamy*, 264 Neb. 784, 652 N.W.2d 86 (2002).

- 524 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

in an adjudicatory capacity can consider additional evidence that does not constitute newly discovered evidence. But we need not decide that issue here, because we conclude that even if the evidence presented by Douglas County could be considered, TERC did not abuse its discretion in denying the motion.

### 4. Douglas County's Motion
#### and Affidavit

Douglas County's motion and affidavit question whether the state improperly included non-arm's-length transactions in its sales file and the PTA's report. The county based its allegations on a comparison between the county's AVU and the state sales file. It alleges that sales which it categorized as non-arm's-length transactions, thus not usable in a sales ratio study, were included in the PTA's assessment ratio study.

The county argues that this violates TERC's regulations. Those regulations require county assessors, when sending a sales worksheet to the state, to "indicate numerically on the sales worksheet their opinion as to whether the sale is qualified or non-qualified for inclusion in the sales file as an arm's length transaction."[85] The Department of Revenue's property assessment division may verify a county assessor's categorization of a sale, but when doing so, "the assessor's opinion with respect to the inclusion, exclusion or adjustment of a sale shall be presumed correct."[86] The property assessment division may override a county assessor's categorization of a sale in some circumstances if it does not agree with it, but if it does so, it "shall, within seven (7) days of such determination, notify the county assessor in writing that the sale will not be included in or excluded from the sales file."[87] The property assessment division did not provide Douglas County

---

[85] 350 Neb. Admin. Code, ch. 12, § 003.03C.

[86] *Id.*, § 003.04.

[87] *Id.*, § 003.04D.

- 525 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

notice of its intent to recategorize and include in the sales file and the PTA's report the sales that the county had categorized as sales nonusable in the AVU. Therefore, Douglas County argues, the PTA improperly included the sales in her study and TERC should have granted the motion to dismiss and vacate its ordered changes that were based on the PTA's report data.

But as TERC points out, the AVU is not the vehicle by which county assessors inform the state about a sale's usability in the sales file. Rather, the AVU is the vehicle by which assessors provide assessment information to match the sales that are already in the state sales file. The information about whether a transaction qualifies as an arm's-length transaction usable in a ratio study is sent from the county assessor to the state in the sales worksheet for each sale, filed on a monthly basis.[88] The AVU is merely the vehicle for conveying the assessment information to match those sales, sent on an annual basis.[89]

Critically, Douglas County has not alleged that the categorization of sales used in the PTA's report differs from that of the sales data sent to the state by Douglas County in the sales worksheets. If there is, in fact, a difference between the categorization of sales in the AVU and that of sales in the PTA's report, it is not clear whether the difference results from a discrepancy between the categorizations of sales in the county's sales worksheets and the PTA's report or from a discrepancy between the county's sales worksheets and the county's AVU.

Douglas County's motion and affidavit fail to allege that the PTA improperly included sales that the county designated *in the sales worksheets* as nonusable. The purpose of the AVU is to send assessment information to match the sales information (including categorization as to usability) already in the sales file. Douglas County's allegations are insufficient to

---

[88] *Id.*, §§ 003.01, 003.03, 003.03A, and 003.03C.

[89] *Id.*, ch. 60, § 002.02A. See, also, § 77-1514(1).

establish that the PTA improperly included non-arm's-length sales in her report.

In its motion to reconsider and affidavit, Douglas County also alleges that the PTA included sales in the wrong valuation area in her sales ratio study. Specifically, it alleges that the PTA included 327 sales from Area 6 in Area 3 and included 526 sales from Area 3 in Area 4. As in the alleged inclusion of non-arm's-length sales, Douglas County contends that this renders the data underlying the PTA's report unreliable and an insufficient basis upon which to rely to order equalization changes.

But these allegations could have been raised before TERC at the show cause hearing. Douglas County had the ability to access the state sales file at any time.[90] We have declined to conclude that Douglas County is procedurally barred from presenting previously available evidence in support of its motion to reconsider. But the fact remains that it could have presented such evidence at the show cause hearing. This fact supports our determination that TERC did not abuse its discretion by denying the motion. After the PTA produced her report for Douglas County on April 8, 2016, that recommended that the value of Areas 3 and 4 be increased, the county had ample time to compare the sales file relied upon by the PTA with its own sales information and present any discrepancies it found to TERC at the show cause hearing on April 27. Instead, Douglas County filed its motion to reconsider and its affidavit in support on May 4.

Not only did Douglas County unnecessarily delay the presentation of these alleged discrepancies to TERC until after the show cause hearing, but the allegations provide no information as to the impact of the alleged errors. The motion and affidavit provide no information that would establish the impact of the allegation that sales from other areas were improperly included in Areas 3 and 4. There was no evidence showing

---

[90] See, 350 Neb. Admin. Code, ch. 12, §§ 001.02 and 003.08 (2009).

- 527 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
COUNTY OF DOUGLAS v. NEBRASKA TAX EQUAL. & REV. COMM.
Cite as 296 Neb. 501

the sales that were alleged to have been improperly included affected whether the ratios in Areas 3 and 4 fell within the acceptable range. The allegations do not state whether these sales would have increased or decreased the median ratio in those areas or would have made no difference at all. Thus, TERC was presented with allegations, but not proof of Douglas County's assertions.

While Douglas County's allegations raised questions whether there were problems with the sales information relied upon by the PTA in producing the report for Douglas County, these allegations did not provide any answers. Douglas County could have raised these allegations at the show cause hearing, and offered the evidence in support, but it failed to do so. TERC did not abuse its discretion when it denied Douglas County's motion to reconsider, and we affirm.

## VI. CONCLUSION

TERC's order to decrease the valuation of Area 2 by 8 percent was not supported by competent evidence and was arbitrary, capricious, and unreasonable. TERC's order to increase the valuation of Areas 3 and 4 was supported by competent evidence and was not arbitrary, capricious, and unreasonable. TERC did not abuse its discretion in denying Douglas County's motion to reconsider its order. We reverse TERC's order as to Area 2 and affirm in all other respects.

AFFIRMED IN PART, AND IN PART REVERSED.

MILLER-LERMAN, J., not participating.